HARPER & ROW, PUBLISHERS, INC., ET AL. *v.*
NATION ENTERPRISES ET AL.

No. 83–1632.   Argued November 6, 1984—Decided May 20, 1985

540

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post*, p. 579.

*Edward A. Miller* argued the cause for petitioners. With him on the briefs were *Barbara Hufham* and *David Otis Fuller, Jr.*

*Floyd Abrams* argued the cause for respondents. With him on the brief were *Devereux Chatillon, Carol E. Rinzler, Andrew L. Deutsch,* and *Leon Friedman.**

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to consider to what extent the "fair use" provision of the Copyright Revision Act of 1976 (here-

---

*Briefs of *amici curiae* urging reversal were filed for the Association of American Publishers, Inc., by *Jon A. Baumgarten* and *Charles H. Lieb;* and for Volunteer Lawyers for the Arts, Inc., by *I. Fred Koenigsberg.*

Briefs of *amici curiae* urging affirmance were filed for the Pen American Center by *Stephen Gillers;* and for Gannett Co., Inc., et al. by *Melville B. Nimmer, Benjamin W. Heineman, Jr., Alice Neff Lucan,* and *Robert C. Lobdell.*

inafter the Copyright Act), 17 U. S. C. § 107, sanctions the unauthorized use of quotations from a public figure's unpublished manuscript. In March 1979, an undisclosed source provided The Nation Magazine with the unpublished manuscript of "A Time to Heal: The Autobiography of Gerald R. Ford." Working directly from the purloined manuscript, an editor of The Nation produced a short piece entitled "The Ford Memoirs—Behind the Nixon Pardon." The piece was timed to "scoop" an article scheduled shortly to appear in Time Magazine. Time had agreed to purchase the exclusive right to print prepublication excerpts from the copyright holders, Harper & Row Publishers, Inc. (hereinafter Harper & Row), and Reader's Digest Association, Inc. (hereinafter Reader's Digest). As a result of The Nation article, Time canceled its agreement. Petitioners brought a successful copyright action against The Nation. On appeal, the Second Circuit reversed the lower court's finding of infringement, holding that The Nation's act was sanctioned as a "fair use" of the copyrighted material. We granted certiorari, 467 U. S. 1214 (1984), and we now reverse.

I

In February 1977, shortly after leaving the White House, former President Gerald R. Ford contracted with petitioners Harper & Row and Reader's Digest, to publish his as yet unwritten memoirs. The memoirs were to contain "significant hitherto unpublished material" concerning the Watergate crisis, Mr. Ford's pardon of former President Nixon and "Mr. Ford's reflections on this period of history, and the morality and personalities involved." App. to Pet. for Cert. C–14—C–15. In addition to the right to publish the Ford memoirs in book form, the agreement gave petitioners the exclusive right to license prepublication excerpts, known in the trade as "first serial rights." Two years later, as the memoirs were nearing completion, petitioners negotiated a prepublication licensing agreement with Time, a weekly news magazine. Time agreed to pay $25,000, $12,500 in advance and an

additional $12,500 at publication, in exchange for the right to excerpt 7,500 words from Mr. Ford's account of the Nixon pardon. The issue featuring the excerpts was timed to appear approximately one week before shipment of the full length book version to bookstores. Exclusivity was an important consideration; Harper & Row instituted procedures designed to maintain the confidentiality of the manuscript, and Time retained the right to renegotiate the second payment should the material appear in print prior to its release of the excerpts.

Two to three weeks before the Time article's scheduled release, an unidentified person secretly brought a copy of the Ford manuscript to Victor Navasky, editor of The Nation, a political commentary magazine. Mr. Navasky knew that his possession of the manuscript was not authorized and that the manuscript must be returned quickly to his "source" to avoid discovery. 557 F. Supp. 1067, 1069 (SDNY 1983). He hastily put together what he believed was "a real hot news story" composed of quotes, paraphrases, and facts drawn exclusively from the manuscript. *Ibid.* Mr. Navasky attempted no independent commentary, research or criticism, in part because of the need for speed if he was to "make news" by "publish[ing] in advance of publication of the Ford book." App. 416–417. The 2,250-word article, reprinted in the Appendix to this opinion, appeared on April 3, 1979. As a result of The Nation's article, Time canceled its piece and refused to pay the remaining $12,500.

Petitioners brought suit in the District Court for the Southern District of New York, alleging conversion, tortious interference with contract, and violations of the Copyright Act. After a 6-day bench trial, the District Judge found that "A Time to Heal" was protected by copyright at the time of The Nation publication and that respondents' use of the copyrighted material constituted an infringement under the Copyright Act, §§ 106(1), (2), and (3), protecting respectively the right to reproduce the work, the right to license preparation of derivative works, and the right of first distribution of

the copyrighted work to the public. App. to Pet. for Cert. C–29—C–30. The District Court rejected respondents' argument that The Nation's piece was a "fair use" sanctioned by § 107 of the Act. Though billed as "hot news," the article contained no new facts. The magazine had "published its article for profit," taking "the heart" of "a soon-to-be published" work. This unauthorized use "caused the *Time* agreement to be aborted and thus diminished the value of the copyright." 557 F. Supp., at 1072. Although certain elements of the Ford memoirs, such as historical facts and memoranda, were not *per se* copyrightable, the District Court held that it was "the totality of these facts and memoranda collected together with Ford's reflections that made them of value to The Nation, [and] this . . . totality . . . is protected by the copyright laws." *Id.*, at 1072–1073. The court awarded actual damages of $12,500.

A divided panel of the Court of Appeals for the Second Circuit reversed. The majority recognized that Mr. Ford's verbatim "reflections" were original "expression" protected by copyright. But it held that the District Court had erred in assuming the "coupling [of these reflections] with uncopyrightable fact transformed that information into a copyrighted 'totality.'" 723 F. 2d 195, 205 (1983). The majority noted that copyright attaches to expression, not facts or ideas. It concluded that, to avoid granting a copyright monopoly over the facts underlying history and news, " 'expression' [in such works must be confined] to its barest elements—the ordering and choice of the words themselves." *Id.*, at 204. Thus similarities between the original and the challenged work traceable to the copying or paraphrasing of uncopyrightable material, such as historical facts, memoranda and other public documents, and quoted remarks of third parties, must be disregarded in evaluating whether the second author's use was fair or infringing.

"When the uncopyrighted material is stripped away, the article in *The Nation* contains, at most, approxi-

mately 300 words that are copyrighted. These remaining paragraphs and scattered phrases are all verbatim quotations from the memoirs which had not appeared previously in other publications. They include a short segment of Ford's conversations with Henry Kissinger and several other individuals. Ford's impressionistic depictions of Nixon, ill with phlebitis after the resignation and pardon, and of Nixon's character, constitute the major portion of this material. It is these parts of the magazine piece on which [the court] must focus in [its] examination of the question whether there was a 'fair use' of copyrighted matter." *Id.*, at 206.

Examining the four factors enumerated in § 107, see *infra,* at 547, n. 2, the majority found the purpose of the article was "news reporting," the original work was essentially factual in nature, the 300 words appropriated were insubstantial in relation to the 2,250-word piece, and the impact on the market for the original was minimal as "the evidence [did] not support a finding that it was the very limited use of expression *per se* which led to Time's decision not to print the excerpt." The Nation's borrowing of verbatim quotations merely "len[t] authenticity to this politically significant material . . . complementing the reporting of the facts." 723 F. 2d, at 208. The Court of Appeals was especially influenced by the "politically significant" nature of the subject matter and its conviction that it is not "the purpose of the Copyright Act to impede that harvest of knowledge so necessary to a democratic state" or "chill the activities of the press by forbidding a circumscribed use of copyrighted words." *Id.,* at 197, 209.

## II

We agree with the Court of Appeals that copyright is intended to increase and not to impede the harvest of knowledge. But we believe the Second Circuit gave insufficient deference to the scheme established by the Copyright Act for

fostering the original works that provide the seed and substance of this harvest. The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors. *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 156 (1975).

Article I, § 8, of the Constitution provides:

> "The Congress shall have Power . . . to Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

As we noted last Term: "[This] limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 429 (1984). "The monopoly created by copyright thus rewards the individual author in order to benefit the public." *Id.*, at 477 (dissenting opinion). This principle applies equally to works of fiction and nonfiction. The book at issue here, for example, was two years in the making, and began with a contract giving the author's copyright to the publishers in exchange for their services in producing and marketing the work. In preparing the book, Mr. Ford drafted essays and word portraits of public figures and participated in hundreds of taped interviews that were later distilled to chronicle his personal viewpoint. It is evident that the monopoly granted by copyright actively served its intended purpose of inducing the creation of new material of potential historical value.

Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright.[1] Under the Copy-

---

[1] Section 106 provides in pertinent part:

"Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and authorize any of the following:

right Act, these rights—to publish, copy, and distribute the author's work—vest in the author of an original work from the time of its creation. § 106. In practice, the author commonly sells his rights to publishers who offer royalties in exchange for their services in producing and marketing the author's work. The copyright owner's rights, however, are subject to certain statutory exceptions. §§ 107–118. Among these is § 107 which codifies the traditional privilege of other authors to make "fair use" of an earlier writer's work.[2] In addition, no author may copyright facts or ideas. § 102. The copyright is limited to those aspects of the work—termed "expression"—that display the stamp of the author's originality.

Creation of a nonfiction work, even a compilation of pure fact, entails originality. See, *e. g., Schroeder* v. *William Morrow & Co.*, 566 F. 2d 3 (CA7 1977) (copyright in gardening directory); cf. *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U. S. 53, 58 (1884) (originator of a photograph may claim copyright in his work). The copyright holders of "A Time to Heal" complied with the relevant statutory notice and reg-

---

"(1) to reproduce the copyrighted work in copies . . . ;

"(2) to prepare derivative works based upon the copyrighted work;

"(3) to distribute copies . . . of the copyrighted work to the public . . . ."

[2] Section 107 states:

"Notwithstanding the provisions of section 106, the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work."

istration procedures. See §§ 106, 401, 408; App. to Pet. for Cert. C–20. Thus there is no dispute that the unpublished manuscript of "A Time to Heal," as a whole, was protected by § 106 from unauthorized reproduction. Nor do respondents dispute that verbatim copying of excerpts of the manuscript's original form of expression would constitute infringement unless excused as fair use. See 1 M. Nimmer, Copyright § 2.11[B], p. 2–159 (1984) (hereinafter Nimmer). Yet copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original—for example, quotations borrowed under the rubric of fair use from other copyrighted works, facts, or materials in the public domain—as long as such use does not unfairly appropriate the author's original contributions. *Ibid.;* A. Latman, Fair Use of Copyrighted Works (1958), reprinted as Study No. 14 in Copyright Law Revision Studies Nos. 14–16, prepared for the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 7 (1960) (hereinafter Latman). Perhaps the controversy between the lower courts in this case over copyrightability is more aptly styled a dispute over whether The Nation's appropriation of unoriginal and uncopyrightable elements encroached on the originality embodied in the work as a whole. Especially in the realm of factual narrative, the law is currently unsettled regarding the ways in which uncopyrightable elements combine with the author's original contributions to form protected expression. Compare *Wainwright Securities Inc.* v. *Wall Street Transcript Corp.,* 558 F. 2d 91 (CA2 1977) (protection accorded author's analysis, structuring of material and marshaling of facts), with *Hoehling* v. *Universal City Studios, Inc.,* 618 F. 2d 972 (CA2 1980) (limiting protection to ordering and choice of words). See, *e. g.,* 1 Nimmer § 2.11[D], at 2–164—2–165.

We need not reach these issues, however, as The Nation has admitted to lifting verbatim quotes of the author's original language totaling between 300 and 400 words and constituting some 13% of The Nation article. In using generous

verbatim excerpts of Mr. Ford's unpublished manuscript to lend authenticity to its account of the forthcoming memoirs, The Nation effectively arrogated to itself the right of first publication, an important marketable subsidiary right. For the reasons set forth below, we find that this use of the copyrighted manuscript, even stripped to the verbatim quotes conceded by The Nation to be copyrightable expression, was not a fair use within the meaning of the Copyright Act.

## III

### A

Fair use was traditionally defined as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." H. Ball, Law of Copyright and Literary Property 260 (1944) (hereinafter Ball). The statutory formulation of the defense of fair use in the Copyright Act reflects the intent of Congress to codify the common-law doctrine. 3 Nimmer § 13.05. Section 107 requires a case-by-case determination whether a particular use is fair, and the statute notes four nonexclusive factors to be considered. This approach was "intended to restate the [pre-existing] judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." H. R. Rep. No. 94–1476, p. 66 (1976) (hereinafter House Report).

"[T]he author's consent to a reasonable use of his copyrighted works ha[d] always been implied by the courts as a necessary incident of the constitutional policy of promoting the progress of science and the useful arts, since a prohibition of such use would inhibit subsequent writers from attempting to improve upon prior works and thus . . . frustrate the very ends sought to be attained." Ball 260. Professor Latman, in a study of the doctrine of fair use commissioned by Congress for the revision effort, see *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 462–463, n. 9 (dissenting opinion), summarized prior law as turning on the "importance

of the material copied or performed from the point of view of the reasonable copyright owner. In other words, would the reasonable copyright owner have consented to the use?" Latman 15.[3]

As early as 1841, Justice Story gave judicial recognition to the doctrine in a case that concerned the letters of another former President, George Washington.

> "[A] reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism. On the other hand, it is as clear, that if he thus cites the most important parts of the work, with a view, not to criticise, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy." *Folsom* v. *Marsh*, 9 F. Cas. 342, 344–345 (No. 4,901) (CC Mass.)

As Justice Story's hypothetical illustrates, the fair use doctrine has always precluded a use that "supersede[s] the use of the original." *Ibid.* Accord, S. Rep. No. 94–473, p. 65 (1975) (hereinafter Senate Report).

Perhaps because the fair use doctrine was predicated on the author's implied consent to "reasonable and customary" use when he released his work for public consumption, fair use traditionally was not recognized as a defense to charges

---

[3] Professor Nimmer notes: "[Perhaps] no more precise guide can be stated than Joseph McDonald's clever paraphrase of the Golden Rule: 'Take not from others to such an extent and in such a manner that you would be resentful if they so took from you.'" 3 Nimmer § 13.05[A], at 13–66, quoting McDonald, Non-infringing Uses, 9 Bull. Copyright Soc. 466, 467 (1962). This "equitable rule of reason," *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 448, "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Iowa State University Research Foundation, Inc.* v. *American Broadcasting Cos.*, 621 F. 2d 57, 60 (CA2 1980). See generally L. Seltzer, Exemptions and Fair Use in Copyright 18–48 (1978).

of copying from an author's as yet unpublished works.[4] Under common-law copyright, "the property of the author . . . in his intellectual creation [was] absolute until he voluntarily part[ed] with the same." *American Tobacco Co.* v. *Werckmeister*, 207 U. S. 284, 299 (1907); 2 Nimmer § 8.23, at 8–273. This absolute rule, however, was tempered in practice by the equitable nature of the fair use doctrine. In a given case, factors such as implied consent through *de facto* publication on performance or dissemination of a work may tip the balance of equities in favor of prepublication use. See Copyright Law Revision—Part 2: Discussion and Comments on Report of the Register of Copyrights on General Revision of the U. S. Copyright Law, 88th Cong., 1st Sess., 27 (H. R. Comm. Print 1963) (discussion suggesting works disseminated to the public in a form not constituting a technical "publication" should nevertheless be subject to fair use); 3 Nimmer § 13.05, at 13–62, n. 2. But it has never been seriously disputed that "the fact that the plaintiff's work is unpublished . . . is a factor tending to negate the defense of fair use." *Ibid.* Publication of an author's expression before he has authorized its dissemination seriously infringes the author's right to decide when and whether it will be made public, a factor not present in fair use of published works.[5]

---

[4] See Latman 7; Strauss, Protection of Unpublished Works (1957), reprinted as Study No. 29 in Copyright Law Revision Studies Nos. 29–31, prepared for the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 4, n. 32 (1961) (citing cases); R. Shaw, Literary Property in the United States 67 (1950) ("[T]here can be no 'fair use' of unpublished material"); Ball 260, n. 5 ("[T]he doctrine of fair use does not apply to unpublished works"); A. Weil, American Copyright Law § 276, p. 115 (1917) (the author of an unpublished work "has, probably, the right to prevent even a 'fair use' of the work by others"). Cf. M. Flint, A User's Guide to Copyright ¶ 10.06 (1979) (United Kingdom) ("no fair dealing with unpublished works"); *Beloff* v. *Pressdram Ltd.*, [1973] All E. R. 241, 263 (Ch. 1972) (same).

[5] See, *e. g.*, *Wheaton* v. *Peters*, 8 Pet. 591, 657 (1834) (distinguishing the author's common-law right to "obtain redress against anyone who . . . by improperly obtaining a copy [of his unpublished work] endeavors to realize

Respondents contend, however, that Congress, in including first publication among the rights enumerated in § 106, which are expressly subject to fair use under § 107, intended that fair use would apply *in pari materia* to published and unpublished works. The Copyright Act does not support this proposition.

The Copyright Act represents the culmination of a major legislative reexamination of copyright doctrine. See *Mills Music, Inc.* v. *Snyder*, 469 U. S. 153, 159–160 (1985); *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 462–463, n. 9 (dissenting opinion). Among its other innovations, it eliminated publication "as a dividing line between common law and statutory protection," House Report, at 129, extending statutory protection to all works from the time of their creation. It also recognized for the first time a distinct statutory right of first publication, which had previously been an element of the common-law protections afforded unpublished works. The Report of the House Committee on the Judiciary confirms that "Clause (3) of section 106, establishes the exclusive right of publications . . . . Under this provision the copyright owner would have the right to control the first public distribution of an authorized copy . . . of his work." *Id.*, at 62.

Though the right of first publication, like the other rights enumerated in § 106, is expressly made subject to the fair use provision of § 107, fair use analysis must always be tailored to the individual case. *Id.*, at 65; 3 Nimmer § 13.05[A]. The

a profit by its publication" from rights in a published work, which are prescribed by statute); *Press Publishing Co.* v. *Monroe*, 73 F. 196, 199 (CA2), writ of error dism'd, 164 U. S. 105 (1896); *Stanley* v. *Columbia Broadcasting System, Inc.*, 35 Cal. 2d 653, 660–661, 221 P. 2d 73, 77–78 (1950) (en banc); *Golding* v. *RKO Radio Pictures, Inc.*, 193 P. 2d 153, 162 (Cal. App. 1948) ("An unauthorized appropriation of [an unpublished work] is not to be neutralized on the plea that 'it is such a little one'"), aff'd, 35 Cal. 2d 690, 221 P. 2d 95 (1950); *Fendler* v. *Morosco*, 253 N. Y. 281, 291, 171 N. E. 56, 59 ("Since plaintiff had not published or produced her play, perhaps any use that others made of it might be unfair"), rehearing denied, 254 N. Y. 563, 173 N. E. 867 (1930).

nature of the interest at stake is highly relevant to whether a given use is fair. From the beginning, those entrusted with the task of revision recognized the "overbalancing reasons to preserve the common law protection of undisseminated works until the author or his successor chooses to disclose them." Copyright Law Revision, Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., 41 (Comm. Print 1961). The right of first publication implicates a threshold decision by the author whether and in what form to release his work. First publication is inherently different from other § 106 rights in that only one person can be the first publisher; as the contract with Time illustrates, the commercial value of the right lies primarily in exclusivity. Because the potential damage to the author from judicially enforced "sharing" of the first publication right with unauthorized users of his manuscript is substantial, the balance of equities in evaluating such a claim of fair use inevitably shifts.

The Senate Report confirms that Congress intended the unpublished nature of the work to figure prominently in fair use analysis. In discussing fair use of photocopied materials in the classroom the Committee Report states:

> "A key, though not necessarily determinative, factor in fair use is whether or not the work is available to the potential user. If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it . . . . The applicability of the fair use doctrine to unpublished works is narrowly limited since, although the work is unavailable, this is the result of a deliberate choice on the part of the copyright owner. Under ordinary circumstances, the copyright owner's 'right of first publication' would outweigh any needs of reproduction for classroom purposes." Senate Report, at 64.

Although the Committee selected photocopying of classroom materials to illustrate fair use, it emphasized that "the same

general standards of fair use are applicable to all kinds of uses of copyrighted material." *Id.,* at 65.   We find unconvincing respondents' contention that the absence of the quoted passage from the House Report indicates an intent to abandon the traditional distinction between fair use of published and unpublished works.   It appears instead that the fair use discussion of photocopying of classroom materials was omitted from the final Report because educators and publishers in the interim had negotiated a set of guidelines that rendered the discussion obsolete.   House Report, at 67.   The House Report nevertheless incorporates the discussion by reference, citing to the Senate Report and stating: "The Committee has reviewed this discussion, and considers it still has value as an analysis of various aspects of the [fair use] problem." *Ibid.*

Even if the legislative history were entirely silent, we would be bound to conclude from Congress' characterization of § 107 as a "restatement" that its effect was to preserve existing law concerning fair use of unpublished works as of other types of protected works and not to "change, narrow, or enlarge it." *Id.,* at 66.   We conclude that the unpublished nature of a work is "[a] key, though not necessarily determinative, factor" tending to negate a defense of fair use.   Senate Report, at 64.   See 3 Nimmer § 13.05, at 13–62, n. 2; W. Patry, The Fair Use Privilege in Copyright Law 125 (1985) (hereinafter Patry).

We also find unpersuasive respondents' argument that fair use may be made of a soon-to-be-published manuscript on the ground that the author has demonstrated he has no interest in nonpublication.   This argument assumes that the unpublished nature of copyrighted material is only relevant to letters or other confidential writings not intended for dissemination.   It is true that common-law copyright was often enlisted in the service of personal privacy.   See Brandeis & Warren, The Right to Privacy, 4 Harv. L. Rev. 193, 198–199 (1890).   In its commercial guise, however, an author's right to choose when he will publish is no less deserving of pro-

tection. The period encompassing the work's initiation, its preparation, and its grooming for public dissemination is a crucial one for any literary endeavor. The Copyright Act, which accords the copyright owner the "right to control the first public distribution" of his work, House Report, at 62, echos the common law's concern that the author or copyright owner retain control throughout this critical stage. See generally Comment, The Stage of Publication as a "Fair Use" Factor: *Harper & Row, Publishers v. Nation Enterprises,* 58 St. John's L. Rev. 597 (1984). The obvious benefit to author and public alike of assuring authors the leisure to develop their ideas free from fear of expropriation outweighs any short-term "news value" to be gained from premature publication of the author's expression. See Goldstein, Copyright and the First Amendment, 70 Colum. L. Rev. 983, 1004–1006 (1970) (The absolute protection the common law accorded to soon-to-be published works "[was] justified by [its] brevity and expedience"). The author's control of first public distribution implicates not only his personal interest in creative control but his property interest in exploitation of prepublication rights, which are valuable in themselves and serve as a valuable adjunct to publicity and marketing. See *Belushi* v. *Woodward,* 598 F. Supp. 36 (DC 1984) (successful marketing depends on coordination of serialization and release to public); Marks, Subsidiary Rights and Permissions, in What Happens in Book Publishing 230 (C. Grannis ed. 1967) (exploitation of subsidiary rights is necessary to financial success of new books). Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use.

## B

Respondents, however, contend that First Amendment values require a different rule under the circumstances of this case. The thrust of the decision below is that "[t]he scope of [fair use] is undoubtedly wider when the information

conveyed relates to matters of high public concern." *Consumers Union of the United States, Inc.* v. *General Signal Corp.*, 724 F. 2d 1044, 1050 (CA2 1983) (construing 723 F. 2d 195 (1983) (case below) as allowing advertiser to quote Consumer Reports), cert. denied, 469 U. S. 823 (1984). Respondents advance the substantial public import of the subject matter of the Ford memoirs as grounds for excusing a use that would ordinarily not pass muster as a fair use—the piracy of verbatim quotations for the purpose of "scooping" the authorized first serialization. Respondents explain their copying of Mr. Ford's expression as essential to reporting the news story it claims the book itself represents. In respondents' view, not only the facts contained in Mr. Ford's memoirs, but "the precise manner in which [he] expressed himself [were] as newsworthy as what he had to say." Brief for Respondents 38–39. Respondents argue that the public's interest in learning this news as fast as possible outweighs the right of the author to control its first publication.

The Second Circuit noted, correctly, that copyright's idea/expression dichotomy "strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression." 723 F. 2d, at 203. No author may copyright his ideas or the facts he narrates. 17 U. S. C. § 102(b). See, *e. g.*, *New York Times Co.* v. *United States*, 403 U. S. 713, 726, n. (1971) (BRENNAN, J., concurring) (Copyright laws are not restrictions on freedom of speech as copyright protects only form of expression and not the ideas expressed); 1 Nimmer § 1.10[B][2]. As this Court long ago observed: "[T]he news element—the information respecting current events contained in the literary production—is not the creation of the writer, but is a report of matters that ordinarily are *publici juris;* it is the history of the day." *International News Service* v. *Associated Press*, 248 U. S. 215, 234 (1918). But copyright assures those who write and publish factual narratives such as "A Time to Heal" that

they may at least enjoy the right to market the original expression contained therein as just compensation for their investment. Cf. *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 575 (1977).

Respondents' theory, however, would expand fair use to effectively destroy any expectation of copyright protection in the work of a public figure. Absent such protection, there would be little incentive to create or profit in financing such memoirs, and the public would be denied an important source of significant historical information. The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use "news report" of the book. See *Wainwright Securities Inc.* v. *Wall Street Transcript Corp.*, 558 F. 2d 91 (CA2 1977), cert. denied, 434 U. S. 1014 (1978).

Nor do respondents assert any actual necessity for circumventing the copyright scheme with respect to the types of works and users at issue here.[6] Where an author and publisher have invested extensive resources in creating an original work and are poised to release it to the public, no legitimate aim is served by pre-empting the right of first publication. The fact that the words the author has chosen to clothe his narrative may of themselves be "newsworthy" is not an independent justification for unauthorized copying of the author's expression prior to publication. To paraphrase another recent Second Circuit decision:

> "[Respondent] possessed an unfettered right to use any factual information revealed in [the memoirs] for the purpose of enlightening its audience, but it can claim

---

[6] It bears noting that Congress in the Copyright Act recognized a public interest warranting specific exemptions in a number of areas not within traditional fair use, see, *e. g.*, 17 U. S. C. § 115 (compulsory license for records); § 105 (no copyright in Government works). No such exemption limits copyright in personal narratives written by public servants after they leave Government service.

no need to 'bodily appropriate' [Mr. Ford's] 'expression' of that information by utilizing portions of the actual [manuscript]. The public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts. The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Iowa State University Research Foundation, Inc.* v. *American Broadcasting Cos., Inc.*, 621 F. 2d 57, 61 (1980) (citations omitted).

Accord, *Roy Export Co. Establishment* v. *Columbia Broadcasting System, Inc.*, 503 F. Supp. 1137 (SDNY 1980) ("newsworthiness" of material copied does not justify copying), aff'd, 672 F. 2d 1095 (CA2), cert. denied, 459 U. S. 826 (1982); *Quinto* v. *Legal Times of Washington, Inc.*, 506 F. Supp. 554 (DC 1981) (same).

In our haste to disseminate news, it should not be forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas. This Court stated in *Mazer* v. *Stein*, 347 U. S. 201, 209 (1954):

> "The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'"

And again in *Twentieth Century Music Corp.* v. *Aiken:*

> "The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate [the creation of useful works] for the general public good." 422 U. S., at 156.

It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public. Such a notion ignores the major premise of copyright and injures author and public alike. "[T]o propose that fair use be imposed whenever the 'social value [of dissemination] . . . outweighs any detriment to the artist,' would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it." Gordon, Fair Use as Market Failure: A Structural and Economic Analysis of the *Betamax* Case and its Predecessors, 82 Colum. L. Rev. 1600, 1615 (1982). And as one commentator has noted: "If every volume that was in the public interest could be pirated away by a competing publisher, . . . the public [soon] would have nothing worth reading." Sobel, Copyright and the First Amendment: A Gathering Storm?, 19 ASCAP Copyright Law Symposium 43, 78 (1971). See generally Comment, Copyright and the First Amendment; Where Lies the Public Interest?, 59 Tulane L. Rev. 135 (1984).

Moreover, freedom of thought and expression "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley* v. *Maynard,* 430 U. S. 705, 714 (1977) (BURGER, C. J.). We do not suggest this right not to speak would sanction abuse of the copyright owner's monopoly as an instrument to suppress facts. But in the words of New York's Chief Judge Fuld:

> "The essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet. There is necessarily, and within suitably defined areas, a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Estate of Hemingway* v. *Random House, Inc.,* 23 N. Y. 2d 341, 348, 244 N. E. 2d 250, 255 (1968).

Courts and commentators have recognized that copyright, and the right of first publication in particular, serve this countervailing First Amendment value. See *Schnapper* v. *Foley*, 215 U. S. App. D. C. 59, 667 F. 2d 102 (1981), cert. denied, 455 U. S. 948 (1982); 1 Nimmer § 1.10[B], at 1–70, n. 24; Patry 140–142.

In view of the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use, we see no warrant for expanding the doctrine of fair use to create what amounts to a public figure exception to copyright. Whether verbatim copying from a public figure's manuscript in a given case is or is not fair must be judged according to the traditional equities of fair use.

## IV

Fair use is a mixed question of law and fact. *Pacific & Southern Co.* v. *Duncan,* 744 F. 2d 1490, 1495, n. 8 (CA11 1984). Where the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court "need not remand for further factfinding . . . [but] may conclude as a matter of law that [the challenged use] do[es] not qualify as a fair use of the copyrighted work." *Id.,* at 1495. Thus whether The Nation article constitutes fair use under § 107 must be reviewed in light of the principles discussed above. The factors enumerated in the section are not meant to be exclusive: "[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." House Report, at 65. The four factors identified by Congress as especially relevant in determining whether the use was fair are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as

a whole; (4) the effect on the potential market for or value of the copyrighted work. We address each one separately.

*Purpose of the Use.* The Second Circuit correctly identified news reporting as the general purpose of The Nation's use. News reporting is one of the examples enumerated in § 107 to "give some idea of the sort of activities the courts might regard as fair use under the circumstances." Senate Report, at 61. This listing was not intended to be exhaustive, see *ibid.;* § 101 (definition of "including" and "such as"), or to single out any particular use as presumptively a "fair" use. The drafters resisted pressures from special interest groups to create presumptive categories of fair use, but structured the provision as an affirmative defense requiring a case-by-case analysis. See H. R. Rep. No. 83, 90th Cong., 1st Sess., 37 (1967); Patry 477, n. 4. "[W]hether a use referred to in the first sentence of section 107 is a fair use in a particular case will depend upon the application of the determinative factors, including those mentioned in the second sentence." Senate Report, at 62. The fact that an article arguably is "news" and therefore a productive use is simply one factor in a fair use analysis.

We agree with the Second Circuit that the trial court erred in fixing on whether the information contained in the memoirs was actually new to the public. As Judge Meskill wisely noted, "[c]ourts should be chary of deciding what is and what is not news." 723 F. 2d, at 215 (dissenting). Cf. *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 345–346 (1974). "The issue is not what constitutes 'news,' but whether a claim of newsreporting is a valid fair use defense to an infringement of *copyrightable expression.*" Patry 119. The Nation has every right to seek to be the first to publish information. But The Nation went beyond simply reporting uncopyrightable information and actively sought to exploit the headline value of its infringement, making a "news event" out of its unauthorized first publication of a noted figure's copyrighted expression.

The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use. "[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 451. In arguing that the purpose of news reporting is not purely commercial, The Nation misses the point entirely. The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price. See *Roy Export Co. Establishment* v. *Columbia Broadcasting System, Inc.*, 503 F. Supp., at 1144; 3 Nimmer § 13.05[A][1], at 13–71, n. 25.3.

In evaluating character and purpose we cannot ignore The Nation's stated purpose of scooping the forthcoming hardcover and Time abstracts.[7] App. to Pet. for Cert. C–27. The Nation's use had not merely the incidental effect but the *intended purpose* of supplanting the copyright holder's commercially valuable right of first publication. See *Meredith Corp.* v. *Harper & Row, Publishers, Inc.*, 378 F. Supp. 686, 690 (SDNY) (purpose of text was to compete with original), aff'd, 500 F. 2d 1221 (CA2 1974). Also relevant to the "character" of the use is "the propriety of the defendant's conduct." 3 Nimmer § 13.05[A], at 13–72. "Fair use presupposes 'good faith' and 'fair dealing.'" *Time Inc.* v. *Bernard Geis Associates*, 293 F. Supp. 130, 146 (SDNY 1968), quoting

---

[7] The dissent excuses The Nation's unconsented use of an unpublished manuscript as "standard journalistic practice," taking judicial notice of New York Times articles regarding the memoirs of John Erlichman, John Dean's "Blind Ambition," and Bernstein and Woodward's "The Final Days" as proof of such practice. *Post*, at 590–593, and n. 14. *Amici curiae* sought to bring this alleged practice to the attention of the Court of Appeals for the Second Circuit, citing these same articles. The Court of Appeals, at Harper & Row's motion, struck these exhibits for failure of proof at trial, Record Doc. No. 19; thus they are not a proper subject for this Court's judicial notice.

Schulman, Fair Use and the Revision of the Copyright Act, 53 Iowa L. Rev. 832 (1968). The trial court found that The Nation knowingly exploited a purloined manuscript. App. to Pet. for Cert. B–1, C–20—C–21, C–28—C–29. Unlike the typical claim of fair use, The Nation cannot offer up even the fiction of consent as justification. Like its competitor news-weekly, it was free to bid for the right of abstracting excerpts from "A Time to Heal." Fair use "distinguishes between 'a true scholar and a chiseler who infringes a work for personal profit.'" *Wainwright Securities Inc.* v. *Wall Street Transcript Corp.*, 558 F. 2d, at 94, quoting from Hearings on Bills for the General Revision of the Copyright Law before the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 8, pt. 3, p. 1706 (1966) (statement of John Schulman).

*Nature of the Copyrighted Work.* Second, the Act directs attention to the nature of the copyrighted work. "A Time to Heal" may be characterized as an unpublished historical narrative or autobiography. The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy. See Gorman, Fact or Fancy? The Implications for Copyright, 29 J. Copyright Soc. 560, 561 (1982).

> "[E]ven within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography. The extent to which one must permit expressive language to be copied, in order to assure dissemination of the underlying facts, will thus vary from case to case." *Id.*, at 563.

Some of the briefer quotes from the memoirs are arguably necessary adequately to convey the facts; for example, Mr. Ford's characterization of the White House tapes as the "smoking gun" is perhaps so integral to the idea expressed as to be inseparable from it. Cf. 1 Nimmer § 1.10[C]. But The Nation did not stop at isolated phrases and instead excerpted subjective descriptions and portraits of public figures whose power lies in the author's individualized expression. Such

use, focusing on the most expressive elements of the work, exceeds that necessary to disseminate the facts.

The fact that a work is unpublished is a critical element of its "nature." 3 Nimmer § 13.05[A]; Comment, 58 St. John's L. Rev., at 613. Our prior discussion establishes that the scope of fair use is narrower with respect to unpublished works. While even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press, see House Report, at 65, the author's right to control the first public appearance of his expression weighs against such use of the work before its release. The right of first publication encompasses not only the choice whether to publish at all, but also the choices of when, where, and in what form first to publish a work.

In the case of Mr. Ford's manuscript, the copyright holders' interest in confidentiality is irrefutable; the copyright holders had entered into a contractual undertaking to "keep the manuscript confidential" and required that all those to whom the manuscript was shown also "sign an agreement to keep the manuscript confidential." App. to Pet. for Cert. C–19—C–20. While the copyright holders' contract with Time required Time to submit its proposed article seven days before publication, The Nation's clandestine publication afforded no such opportunity for creative or quality control. *Id.*, at C–18. It was hastily patched together and contained "a number of inaccuracies." App. 300b–300c (testimony of Victor Navasky). A use that so clearly infringes the copyright holder's interests in confidentiality and creative control is difficult to characterize as "fair."

*Amount and Substantiality of the Portion Used.* Next, the Act directs us to examine the amount and substantiality of the portion used in relation to the copyrighted work as a whole. In absolute terms, the words actually quoted were an insubstantial portion of "A Time to Heal." The District Court, however, found that "[T]he Nation took what was

essentially the heart of the book." 557 F. Supp., at 1072. We believe the Court of Appeals erred in overruling the District Judge's evaluation of the qualitative nature of the taking. See, *e. g.*, *Roy Export Co. Establishment* v. *Columbia Broadcasting System, Inc.*, 503 F. Supp., at 1145 (taking of 55 seconds out of 1 hour and 29-minute film deemed qualitatively substantial). A Time editor described the chapters on the pardon as "the most interesting and moving parts of the entire manuscript." Reply Brief for Petitioners 16, n. 8. The portions actually quoted were selected by Mr. Navasky as among the most powerful passages in those chapters. He testified that he used verbatim excerpts because simply reciting the information could not adequately convey the "absolute certainty with which [Ford] expressed himself," App. 303; or show that "this comes from President Ford," *id.*, at 305; or carry the "definitive quality" of the original, *id.*, at 306. In short, he quoted these passages precisely because they qualitatively embodied Ford's distinctive expression.

As the statutory language indicates, a taking may not be excused merely because it is insubstantial with respect to the *infringing* work. As Judge Learned Hand cogently remarked, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 81 F. 2d 49, 56 (CA2), cert. denied, 298 U. S. 669 (1936). Conversely, the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression.

Stripped to the verbatim quotes,[8] the direct takings from the unpublished manuscript constitute at least 13% of the in-

---

[8] See Appendix to this opinion, *post*, p. 570. The Court of Appeals found that only "approximately 300 words" were copyrightable but did not specify which words. The court's discussion, however, indicates it

fringing article.  See *Meeropol* v. *Nizer*, 560 F. 2d 1061, 1071 (CA2 1977) (copyrighted letters constituted less than 1% of infringing work but were prominently featured).  The Nation article is structured around the quoted excerpts which serve as its dramatic focal points.  See Appendix to this opinion, *post*, p. 570.  In view of the expressive value of the excerpts and their key role in the infringing work, we cannot agree with the Second Circuit that the "magazine took a meager, indeed an infinitesimal amount of Ford's original language."  723 F. 2d, at 209.

*Effect on the Market.*  Finally, the Act focuses on "the effect of the use upon the potential market for or value of the copyrighted work."  This last factor is undoubtedly the single most important element of fair use.[9]  See 3 Nimmer § 13.05[A], at 13–76, and cases cited therein.  "Fair use, when properly applied, is limited to copying by others which

---

excluded from consideration those portions of The Nation's piece that, although copied verbatim from Ford's manuscript, were quotes attributed by Ford to third persons and quotations from Government documents.  At oral argument, counsel for The Nation did not dispute that verbatim quotes and very close paraphrase could constitute infringement.  Tr. of Oral Arg. 24–25.  Thus the Appendix identifies as potentially infringing only verbatim quotes or very close paraphrase and excludes from consideration Government documents and words attributed to third persons.  The Appendix is not intended to endorse any particular rule of copyrightability but is intended merely as an aid to facilitate our discussion.

[9] Economists who have addressed the issue believe the fair use exception should come into play only in those situations in which the market fails or the price the copyright holder would ask is near zero.  See, *e. g.*, T. Brennan, *Harper & Row* v. *The Nation*, Copyrightability and Fair Use, Dept. of Justice Economic Policy Office Discussion Paper 13–17 (1984); Gordon, Fair Use as Market Failure: A Structural and Economic Analysis of the *Betamax* Case and its Predecessors, 82 Colum. L. Rev. 1600, 1615 (1982).  As the facts here demonstrate, there is a fully functioning market that encourages the creation and dissemination of memoirs of public figures.  In the economists' view, permitting "fair use" to displace normal copyright channels disrupts the copyright market without a commensurate public benefit.

does not materially impair the marketability of the work which is copied." 1 Nimmer § 1.10[D], at 1–87. The trial court found not merely a potential but an actual effect on the market. Time's cancellation of its projected serialization and its refusal to pay the $12,500 were the direct effect of the infringement. The Court of Appeals rejected this fact-finding as clearly erroneous, noting that the record did not establish a causal relation between Time's nonperformance and respondents' unauthorized publication of Mr. Ford's *expression* as opposed to the facts taken from the memoirs. We disagree. Rarely will a case of copyright infringement present such clear-cut evidence of actual damage. Petitioners assured Time that there would be no other authorized publication of *any* portion of the unpublished manuscript prior to April 23, 1979. *Any* publication of material from chapters 1 and 3 would permit Time to renegotiate its final payment. Time cited The Nation's article, which contained verbatim quotes from the unpublished manuscript, as a reason for its nonperformance. With respect to apportionment of profits flowing from a copyright infringement, this Court has held that an infringer who commingles infringing and noninfringing elements "must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him." *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 309 U. S. 390, 406 (1940). Cf. 17 U. S. C. § 504(b) (the infringer is required to prove elements of profits attributable to other than the infringed work). Similarly, once a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression. See 3 Nimmer § 14.02, at 14–7—14–8.1. Petitioners established a prima facie case of actual damage that respondents failed to rebut. See *Stevens Linen Associates*,

*Inc.* v. *Mastercraft Corp.*, 656 F. 2d 11, 15 (CA2 1981). The trial court properly awarded actual damages and accounting of profits. See 17 U. S. C. § 504(b).

More important, to negate fair use one need only show that if the challenged use "should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 451 (emphasis added); *id.*, at 484, and n. 36 (collecting cases) (dissenting opinion). This inquiry must take account not only of harm to the original but also of harm to the market for derivative works. See *Iowa State University Research Foundation, Inc.* v. *American Broadcasting Cos.*, 621 F. 2d 57 (CA2 1980); *Meeropol* v. *Nizer, supra,* at 1070; *Roy Export* v. *Columbia Broadcasting System, Inc.*, 503 F. Supp., at 1146. "If the defendant's work adversely affects the value of any of the rights in the copyrighted work (in this case the adaptation [and serialization] right) the use is not fair." 3 Nimmer § 13.05[B], at 13–77—13–78 (footnote omitted).

It is undisputed that the factual material in the balance of The Nation's article, besides the verbatim quotes at issue here, was drawn exclusively from the chapters on the pardon. The excerpts were employed as featured episodes in a story about the Nixon pardon—precisely the use petitoners had licensed to Time. The borrowing of these verbatim quotes from the unpublished manuscript lent The Nation's piece a special air of authenticity—as Navasky expressed it, the reader would know it was Ford speaking and not The Nation. App. 300c. Thus it directly competed for a share of the market for prepublication excerpts. The Senate Report states:

> "With certain special exceptions . . . a use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement." Senate Report, at 65.

Placed in a broader perspective, a fair use doctrine that permits extensive prepublication quotations from an unreleased manuscript without the copyright owner's consent poses substantial potential for damage to the marketability of first serialization rights in general. "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." *Ibid.*

## V

The Court of Appeals erred in concluding that The Nation's use of the copyrighted material was excused by the public's interest in the subject matter. It erred, as well, in overlooking the unpublished nature of the work and the resulting impact on the potential market for first serial rights of permitting unauthorized prepublication excerpts under the rubric of fair use. Finally, in finding the taking "infinitesimal," the Court of Appeals accorded too little weight to the qualitative importance of the quoted passages of original expression. In sum, the traditional doctrine of fair use, as embodied in the Copyright Act, does not sanction the use made by The Nation of these copyrighted materials. Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work. See *Pacific & Southern Co.* v. *Duncan,* 744 F. 2d, at 1499–1500. But Congress has not designed, and we see no warrant for judicially imposing, a "compulsory license" permitting unfettered access to the unpublished copyrighted expression of public figures.

The Nation conceded that its verbatim copying of some 300 words of direct quotation from the Ford manuscript would constitute an infringement unless excused as a fair use. Because we find that The Nation's use of these verbatim excerpts from the unpublished manuscript was not a fair use, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

The portions of The Nation article which were copied verbatim from "A Time to Heal," excepting quotes from Government documents and quotes attributed by Ford to third persons, are identified in boldface in the text. See *ante,* at 562, n. 7. The corresponding passages in the Ford manuscript are footnoted.

## THE FORD MEMOIRS
## BEHIND THE NIXON
## PARDON

In his memoirs, *A Time To Heal,* which Harper & Row will publish in late May or early June, former President Gerald R. Ford says that the idea of giving a blanket pardon to Richard M. Nixon was raised before Nixon resigned from the Presidency by Gen. Alexander Haig, who was then the White House chief of staff.

Ford also writes that, but for a misunderstanding, he might have selected Ronald Reagan as his 1976 running mate, that Washington lawyer Edward Bennett Williams, a Democrat, was his choice for head of the Central Intelligence Agency, that Nixon was the one who first proposed Rockefeller for Vice President, and that he regretted his **"cowardice"**[1] in allowing Rockefeller to remove himself from Vice Presidential contention. Ford also describes his often prickly relations with Henry Kissinger.

*The Nation* obtained the 655-page typescript before publication. Advance excerpts from the book will appear in *Time* in mid-April and in *The Reader's Digest* thereafter. Although the initial print order has not been decided, the figure is tentatively set at 50,000; it could change, depending upon the public reaction to the serialization.

Ford's account of the Nixon pardon contains significant new detail on the negotiations and considerations that sur-

---

[1] I was angry at myself for showing cowardice in not saying to the ultraconservatives, "It's going to be Ford and Rockefeller, whatever the consequences." p. 496.

rounded it. According to Ford's version, the subject was first broached to him by General Haig on August 1, 1974, a week before Nixon resigned. General Haig revealed that the newly transcribed White House tapes were the equivalent of the **"smoking gun"** [2] and that Ford should prepare himself to become President.

Ford was deeply hurt by Haig's revelation: **"Over the past several months Nixon had repeatedly assured me that he was not involved in Watergate, that the evidence would prove his innocence, that the matter would fade from view."** [3] Ford had believed him, but he let Haig explain the President's alternatives.

He could **"ride it out"** [4] or he could resign, Haig said. He then listed the different ways Nixon might resign and concluded by pointing out that **Nixon could agree to leave in return for an agreement that the new President, Ford, would pardon him.** [5] Although Ford said it would be improper for him to make any recommendation, he basically agreed with Haig's assessment and adds, **"Because of his references to the pardon authority, I did ask Haig about the extent of a President's pardon power."** [6]

"It's my understanding from a White House lawyer," Haig replied, "that a President does have authority to grant a pardon even before criminal action has been taken against an individual."

---

[2] [I]t contained the so-called smoking gun. p. 3.

[3] [O]ver the past several months Nixon had repeatedly assured me that he was not involved in Watergate, that the evidence would prove his innocence, that the matter would fade from view. p. 7.

[4] The first [option] was that he could try to "ride it out" by letting impeachment take its natural course through the House and the Senate trial, fighting against conviction all the way. p. 4.

[5] Finally, Haig said that according to some on Nixon's White House staff, Nixon could agree to leave in return for an agreement that the new President—Gerald Ford—would pardon him. p. 5.

[6] Because of his references to pardon authority, I did ask Haig about the extent of a President's pardon power. pp. 5–6.

But because Ford had neglected to tell Haig he thought the idea of a resignation conditioned on a pardon was improper, his press aide, Bob Hartmann, suggested that Haig might well have returned to the White House and told President Nixon that he had mentioned the idea and Ford seemed comfortable with it. "Silence implies assent."

Ford then consulted with White House special counsel James St. Clair, who had no advice one way or the other on the matter more than pointing out that he was not the lawyer who had given Haig the opinion on the pardon. Ford also discussed the matter with Jack Marsh, who felt that the mention of a pardon in this context was a "time bomb," and with Bryce Harlow, who had served six Presidents and who agreed that **the mere mention of a pardon "could cause a lot of trouble."** [7]

As a result of these various conversations, Vice President Ford called Haig and read him a written statement: "I want you to understand that I have no intention of recommending what the President should do about resigning or not resigning and that nothing we talked about yesterday afternoon should be given any consideration in whatever decision the President may wish to make."

Despite what Haig had told him about the "smoking gun" tapes, Ford told a Jackson, Mich., luncheon audience later in the day that **the President was not guilty of an impeachable offense. "Had I said otherwise at that moment,"** he writes, **"the whole house of cards might have collapsed."** [8]

In justifying the pardon, Ford goes out of his way to assure the reader that **"compassion for Nixon as an individual**

---

[7] Only after I had finished did [Bryce Harlow] let me know in no uncertain terms that he agreed with Bob and Jack, that the mere mention of the pardon option could cause a lot of trouble in the days ahead. p. 18.

[8] During the luncheon I repeated my assertion that the President was not guilty of an impeachable offense. Had I said otherwise at that moment, the whole house of cards might have collapsed. p. 21.

hadn't prompted my decision at all."[9]  Rather, he did it because he had "to get the monkey off my back one way or the other."[10]

The precipitating factor in his decision was a series of secret meetings his general counsel, Phil Buchen, held with Watergate Special Prosecutor Leon Jaworski in the Jefferson Hotel, where they were both staying at the time.  Ford attributes Jaworski with providing some "crucial" information[11]—i. e., that Nixon was under investigation in ten separate areas, and that the court process could "take years."[12]  Ford cites a memorandum from Jaworski's assistant, Henry S. Ruth Jr., as being especially persuasive. Ruth had written:

"If you decide to recommend indictment I think it is fair and proper to notify Jack Miller and the White House sufficiently in advance so that pardon action could be taken before the indictment."  He went on to say: "One can make a strong argument for leniency and if President Ford is so inclined, I think he ought to do it early rather than late."

Ford decided that court proceedings against Nixon might take six years, that Nixon "would not spend time quietly in San Clemente,"[13] and "it would be virtually impossible for me to direct public attention on anything else."[14]

Buchen, Haig and Henry Kissinger agreed with him. Hartmann was not so sure.

---

[9] But compassion for Nixon as an individual hadn't prompted my decision at all.   p. 266.

[10] I had to get the monkey off my back one way or another.   p. 236.

[11] Jaworski gave Phil several crucial pieces of information.   p. 246.

[12] And if the verdict was Guilty, one had to assume that Nixon would appeal.   That process would take years.   p. 248.

[13] The entire process would no doubt require years: a minimum of two, a maximum of six.   And Nixon would not spend time quietly in San Clemente.   p. 238.

[14] It would be virtually impossible for me to direct public attention on anything else.   p. 239.

Buchen wanted to condition the pardon on Nixon agreeing to settle the question of who would retain custody and control over the tapes and Presidential papers that might be relevant to various Watergate proceedings, but Ford was reluctant to do that.

At one point a plan was considered whereby the Presidential materials would be kept in a vault at a Federal facility near San Clemente, but the vault would require two keys to open it. One would be retained by the General Services Administration, the other by Richard Nixon.

The White House did, however, want Nixon to make a full confession on the occasion of his pardon or, at a minimum, express true contrition. Ford tells of the negotiation with Jack Miller, Nixon's lawyer, over the wording of Nixon's statement. But as Ford reports Miller's response. Nixon was not likely to yield. **"His few meetings with his client had shown him that the former President's ability to discuss Watergate objectively was almost nonexistent."** [15]

The statement they really wanted was never forthcoming. As soon as Ford's emissary arrived in San Clemente, he was confronted with an ultimatum by Ron Zeigler, Nixon's former press secretary. "Lets get one thing straight immediately," Zeigler said. "President Nixon is not issuing any statement whatsoever regarding Watergate, whether Jerry Ford pardons him or not." Zeigler proposed a draft, which was turned down on the ground that **"no statement would be better than that."** [16] They went through three more drafts before they agreed on the statement Nixon finally made, which stopped far short of a full confession.

When Ford aide Benton Becker tried to explain to Nixon that acceptance of a pardon was an admission of guilt, he

---

[15] But [Miller] wasn't optimistic about getting such a statement. His few meetings with his client had shown him that the former President's ability to discuss Watergate objectively was almost nonexistent. p. 246.

[16] When Zeigler asked Becker what he thought of it, Becker replied that *no* statement would be better than that. p. 251.

felt the President wasn't really listening. Instead, Nixon wanted to talk about the Washington Redskins. And when Becker left, Nixon pressed on him some cuff links and a tiepin "out of my own jewelry box."

Ultimately, Ford sums up the philosophy underlying his decision as one he picked up as a student at Yale Law School many years before. **"I learned that public policy often took precedence over a rule of law. Although I respected the tenet that no man should be above the law, public policy demanded that I put Nixon—and Watergate—behind us as quickly as possible."** [17]

Later, when Ford learned that Nixon's phlebitis had acted up and his health was seriously impaired, he debated whether to pay the ailing former President a visit. **"If I made the trip it would remind everybody of Watergate and the pardon. If I didn't, people would say I lacked compassion."** [18] Ford went:

**He was stretched out flat on his back. There were tubes in his nose and mouth, and wires led from his arms, chest and legs to machines with orange lights that blinked on and off. His face was ashen, and I thought I had never seen anyone closer to death.** [19]

The manuscript made available to The Nation includes many references to Henry Kissinger and other personalities who played a major role during the Ford years.

---

[17] Years before, at Yale Law School, I'd learned that public policy often took precedence over a rule of law. Although I respected the tenet that no man should be above the law, public policy demanded that I put Nixon— and Watergate—behind us as quickly as possible. p. 256.

[18] My staff debated whether or not I ought to visit Nixon at the Long Beach Hospital, only half an hour away. If I made the trip, it would remind everyone of Watergate and the pardon. If I didn't, people would say I lacked compassion. I ended their debate as soon as I found out it had begun. Of course I would go. p. 298.

[19] He was stretched out flat on his back. There were tubes in his nose and mouth, and wires led from his arms, chest and legs to machines with orange lights that blinked on and off. His face was ashen, and I thought I had never seen anyone closer to death. p. 299.

*On Kissinger.* Immediately after being informed by Nixon of his intention to resign, Ford returned to the Executive Office Building and phoned Henry Kissinger to let him know how he felt. **"Henry,"** he said, **"I need you. The country needs you. I want you to stay. I'll do everything I can to work with you."** [20]

"Sir," Kissinger replied, "it is my job to get along with you and not yours to get along with me."

**"We'll get along,"** Ford said. **"I know we'll get along."** Referring to Kissinger's joint jobs as Secretary of State and National Security Adviser to the President, Ford said, **"I don't want to make any change. I think it's worked out well, so let's keep it that way."** [21]

Later Ford did make the change and relieved Kissinger of his responsibilities as National Security Adviser at the same time that he fired James Schlesinger as Secretary of Defense. Shortly thereafter, he reports, Kissinger presented him with a "draft" letter of resignation, which he said Ford could call upon at will if he felt he needed it to quiet dissent from conservatives who objected to Kissinger's role in the firing of Schlesinger.

*On John Connally.* When Ford was informed that Nixon wanted him to replace Agnew, he told the President he had **"no ambition to hold office after January 1977."** [22] Nixon replied that that was good since his own choice for his running mate in 1976 was John Connally. "He'd be excellent," observed Nixon. Ford says he had "no problem with that."

---

[20] "Henry," I said when he came on the line, "I need you. The country needs you. I want you to stay. I'll do everything I can to work with you." p. 46.

[21] "We'll get along," I said. "I know we can get along." We talked about the two hats he wore, as Secretary of State and National Security Adviser to the President. "I don't want to make any change," I said. "I think it's worked out well, so let's keep it that way." p. 46.

[22] I told him about my promise to Betty and said that I had no ambitions to hold office after January 1977. p. 155.

*On the Decision to Run Again.* Ford was, he tells us, so sincere in his intention not to run again that he thought he would announce it and enhance his credibility in the country and the Congress, as well as keep the promise he had made to his wife, Betty.

Kissinger talked him out of it. "You can't do that. It would be disastrous from a foreign policy point of view. For the next two and a half years foreign governments would know that they were dealing with a lame-duck President. All our initiatives would be dead in the water, and I wouldn't be able to implement your foreign policy. It would probably have the same consequences in dealing with the Congress on domestic issues. You can't reassert the authority of the Presidency if you leave yourself hanging out on a dead limb. You've got to be an affirmative President."

*On David Kennerly, the White House photographer.* Schlesinger was arguing with Kissinger and Ford over the appropriate response to the seizure of the *Mayaguez.* At issue was whether airstrikes against the Cambodians were desirable; Schlesinger was opposed to bombings. Following a lull in the conversation, Ford reports, up spoke the 30-year-old White House photographer, David Kennerly, who had been taking pictures for the last hour.

"Has anyone considered," Kennerly asked, "that this might be the act of a local Cambodian commander who has just taken it into his own hands to stop any ship that comes by?" Nobody, apparently, had considered it, but following several seconds of silence, Ford tells us, the view carried the day. **"Massive airstrikes would constitute overkill,"** Ford decided. **"It would be far better to have Navy jets from the Coral Sea make surgical strikes against specific targets."** [23]

---

[23] Subjectively, I felt that what Kennerly had said made a lot of sense. Massive airstrikes would constitute overkill. It would be far better to have Navy jets from the *Coral Sea* make surgical strikes against specific targets in the vicinity of Kompong Som. p. 416.

*On Nixon's Character.* **Nixon's flaw, according to Ford, was "pride." "A terribly proud man," writes Ford, "he detested weakness in other people. I'd often heard him speak disparagingly of those whom he felt to be soft and expedient. (Curiously, he didn't feel that the press was weak. Reporters, he sensed, were his adversaries. He knew they didn't like him, and he responded with reciprocal disdain.)"** [24]

Nixon felt disdain for the Democratic leadership of the House, whom he also regarded as weak. According to Ford, **"His pride and personal contempt for weakness had overcome his ability to tell the difference between right and wrong,"** [25] all of which leads Ford to wonder whether Nixon had known in advance about Watergate.

On hearing Nixon's resignation speech, which Ford felt lacked an adequate plea for forgiveness, he was persuaded that **"Nixon was out of touch with reality."** [26]

In February of last year, when *The Washington Post* obtained and printed advance excerpts from H. R. Haldeman's memoir, *The Ends of Power*, on the eve of its publication by Times Books, *The New York Times* called *The Post's* feat "a second-rate burglary."

*The Post* disagreed, claiming that its coup represented "first-rate enterprise" and arguing that it had burglarized nothing, that publication of the Haldeman memoir came under the Fair Comment doctrine long recognized by the

---

[24] In Nixon's case, that flaw was pride. A terribly proud man, he detested weakness in other people. I'd often heard him speak disparagingly of those whom he felt to be soft and expedient. (Curiously, he didn't feel that the press was weak. Reporters, he sensed, were his adversaries. He knew they didn't like him, and he responded with reciprocal disdain.) p. 53.

[25] His pride and personal contempt for weakness had overcome his ability to tell the difference between right and wrong. p. 54.

[26] The speech lasted fifteen minutes, and at the end I was convinced Nixon was out of touch with reality. p. 57.

courts, and that "There is a fundamental journalistic principle here—a First Amendment principle that was central to the Pentagon Papers case."

In the issue of *The Nation* dated May 5, 1979, our special Spring Books number, we will discuss some of the ethical problems raised by the issue of disclosure.

JUSTICE BRENNAN, with whom JUSTICE WHITE and JUSTICE MARSHALL join, dissenting.

The Court holds that The Nation's quotation of 300 words from the unpublished 200,000-word manuscript of President Gerald R. Ford infringed the copyright in that manuscript, even though the quotations related to a historical event of undoubted significance—the resignation and pardon of President Richard M. Nixon. Although the Court pursues the laudable goal of protecting "the economic incentive to create and disseminate ideas," *ante,* at 558, this zealous defense of the copyright owner's prerogative will, I fear, stifle the broad dissemination of ideas and information copyright is intended to nurture. Protection of the copyright owner's economic interest is achieved in this case through an exceedingly narrow definition of the scope of fair use. The progress of arts and sciences and the robust public debate essential to an enlightened citizenry are ill served by this constricted reading of the fair use doctrine. See 17 U. S. C. § 107. I therefore respectfully dissent.

I

A

This case presents two issues. First, did The Nation's use of material from the Ford manuscript in forms other than direct quotation from that manuscript infringe Harper & Row's copyright. Second, did the quotation of approximately 300 words from the manuscript infringe the copyright because this quotation did not constitute "fair use" within the mean-

ing of § 107 of the Copyright Act.   17 U. S. C. § 107.   The Court finds no need to resolve the threshold copyrightability issue.   The use of 300 words of quotation was, the Court finds, beyond the scope of fair use and thus a copyright infringement.[1]   Because I disagree with the Court's fair use holding, it is necessary for me to decide the threshold copyrightability question.

### B

"The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings . . . but upon the ground that the welfare of the public will be served and progress of science and useful arts will be promoted by securing to authors for limited periods the exclusive rights to their writings."   H. R. Rep. No. 2222, 60th Cong., 2d Sess., 7 (1909).   Congress thus seeks to define the rights included in copyright so as to serve the public welfare and not necessarily so as to maximize an author's control over his or her product.   The challenge of copyright is to strike the "difficult balance between the interests of authors and inventors in the control and exploitation of their writings and discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 429 (1984).

The "originality" requirement now embodied in § 102 of the Copyright Act is crucial to maintenance of the appropriate balance between these competing interests.[2]   Properly in-

---

[1] In bypassing the threshold issue, the Court certainly does not intimate that The Nation's use of ideas and information other than the quoted material would constitute a violation of the copyright laws.   At one point in its opinion the Court correctly states the governing principles with respect to the copyrightability question.   See *ante*, at 556 ("No author may copyright his ideas or the facts he narrates").

[2] Section 102(b) states: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such

terpreted in the light of the legislative history, this section extends copyright protection to an author's literary form but permits free use by others of the ideas and information the author communicates. See S. Rep. No. 93–983, pp. 107–108 (1974) ("Copyright does not preclude others from using the ideas or information revealed by the author's work. It pertains to the literary . . . form in which the author expressed intellectual concepts"); H. P. Rep. No. 94–1476, pp. 56–57 (1976) (same); *New York Times Co. v. United States*, 403 U. S. 713, 726, n. (1971) (BRENNAN, J., concurring) ("[T]he copyright laws, of course, protect only the form of expression and not the ideas expressed"). This limitation of protection to literary form precludes any claim of copyright in facts, including historical narration.

> "It is not to be supposed that the framers of the Constitution, when they empowered Congress 'to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries' (Const., Art I, § 8, par. 8), intended to confer upon one who might happen to be the first to report a historic event the exclusive right for any period to spread the knowledge of it." *International News Service v. Associated Press*, 248 U. S. 215, 234 (1918).

Accord, *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F. 2d 303, 309 (CA2 1966), cert. denied, 385 U. S. 1009 (1967). See 1 Nimmer § 2.11[A], at 2–158.[3]

---

work." 17 U. S. C. § 102(b). The doctrines of fair use, see 17 U. S. C. § 107, and substantial similarity, see 3 M. Nimmer, Copyright § 13.05 (1984) (hereinafter Nimmer), also function to accommodate these competing considerations. See generally Gorman, Fact or Fancy? The Implications for Copyright, 29 J. Copyright Soc. 560 (1982).

[3] By the same token, an author may not claim copyright in statements made by others and reported verbatim in the author's work. See *Suid v. Newsweek Magazine*, 503 F. Supp. 146, 148 (DC 1980); *Rokeach v. Avco Embassy Pictures Corp.*, 197 USPQ 155, 161 (SDNY 1978).

The "promotion of science and the useful arts" requires this limit on the scope of an author's control. Were an author able to prevent subsequent authors from using concepts, ideas, or facts contained in his or her work, the creative process would wither and scholars would be forced into unproductive replication of the research of their predecessors. See *Hoehling* v. *Universal City Studios, Inc.*, 618 F. 2d 972, 979 (CA2 1980). This limitation on copyright also ensures consonance with our most important First Amendment values. Cf. *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 577, n. 13 (1977). Our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964), leaves no room for a statutory monopoly over information and ideas. "The arena of public debate would be quiet, indeed, if a politician could copyright his speeches or a philosopher his treatises and thus obtain a monopoly on the ideas they contained." *Lee* v. *Runge*, 404 U. S. 887, 893 (1971) (Douglas, J., dissenting from denial of certiorari). A broad dissemination of principles, ideas, and factual information is crucial to the robust public debate and informed citizenry that are "the essence of self-government." *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964). And every citizen must be permitted freely to marshal ideas and facts in the advocacy of particular political choices.[4]

It follows that infringement of copyright must be based on a taking of literary form, as opposed to the ideas or information contained in a copyrighted work. Deciding whether an infringing appropriation of literary form has occurred is difficult for at least two reasons. First, the distinction between

---

[4] It would be perverse to prohibit government from limiting the financial resources upon which a political speaker may draw, see *FEC* v. *National Conservative Political Action Committee*, 470 U. S. 480 (1985), but to permit government to limit the intellectual resources upon which that speaker may draw.

literary form and information or ideas is often elusive in practice. Second, infringement must be based on a *substantial* appropriation of literary form. This determination is equally challenging. Not surprisingly, the test for infringement has defied precise formulation.[5] In general, though, the inquiry proceeds along two axes: *how closely* has the second author tracked the first author's particular language and structure of presentation; and *how much* of the first author's language and structure has the second author appropriated.[6]

In the present case the infringement analysis must be applied to a historical biography in which the author has chronicled the events of his White House tenure and commented on those events from his unique perspective. Apart from the quotations, virtually all of the material in The Nation's article indirectly recounted Mr. Ford's factual narrative of the Nixon resignation and pardon, his latter-day reflections on some events of his Presidency, and his perceptions of the personalities at the center of those events. See *ante*, at 570–579. No copyright can be claimed in this information *qua* information. Infringement would thus have to be based

---

[5] The protection of literary form must proscribe more than merely word-for-word appropriation of substantial portions of an author's work. Otherwise a plagiarist could avoid infringement by immaterial variations. *Nichols* v. *Universal Pictures Corp.*, 45 F. 2d 119, 121 (CA2 1930). The step beyond the narrow and clear prohibition of wholesale copying is, however, a venture onto somewhat uncertain terrain. Compare *Hoehling* v. *Universal City Studios, Inc.*, 618 F. 2d 972, 974 (CA2 1980), with *Wainwright Securities Inc.* v. *Wall Street Transcript Corp.*, 558 F. 2d 91 (CA2 1977). See also 1 Nimmer § 1.10B, at 1–73—1–74 ("It is the particular selection and arrangement of ideas, as well as a given specificity in the form of their expression, which warrants protection"); Chafee, Reflections on the Law of Copyright: I, 45 Colum. L. Rev. 503, 513 (1945) ("[T]he line . . . lie[s] somewhere between the author's idea and the precise form in which he wrote it down. . . . [T]he protection covers the 'pattern' of the work"); Gorman, *supra*, at 593 ("too literal and substantial copying and paraphrasing of . . . language").

[6] The inquiry into the substantiality of appropriation has a quantitative and a qualitative aspect.

on too close and substantial a tracking of Mr. Ford's expression of this information.[7]

*The Language.* Much of the information The Nation conveyed was not in the form of paraphrase at all, but took the form of synopsis of lengthy discussions in the Ford manuscript.[8] In the course of this summary presentation, The

---

[7] Neither the District Court nor the dissent in the Court of Appeals approached the question in this way. Despite recognizing that this material was not "per se copyrightable," the District Court held that the "totality of these facts and memoranda collected together with Mr. Ford's reflections . . . is protected by the copyright laws." 557 F. Supp. 1067, 1072–1073 (SDNY 1983). The dissent in the Court of Appeals signaled approval of this approach. 723 F. 2d 195, 213–214 (CA2 1983) (Meskill, J., dissenting). Such an approach must be rejected. Copyright protection cannot be extended to factual information whenever that information is interwoven with protected expression (purportedly in this case Mr. Ford's reflections) into an expressive "totality." Most works of history or biography blend factual narrative and reflective or speculative commentary in this way. Precluding subsequent use of facts so presented cannot be squared with the specific legislative intent, expressed in both House and Senate Reports, that "[c]opyright does not preclude others from using the . . . information revealed by the author's work." See S. Rep. No. 93–983, pp. 107–108 (1974); H. R. Rep. No. 94–1476, pp. 56–57 (1976). The core purposes of copyright would be thwarted and serious First Amendment concerns would arise. An author could obtain a monopoly on narration of historical events simply by being the first to discuss them in a reflective or analytical manner.

[8] For example, the Ford manuscript expends several hundred words discussing relations between Mr. Ford and Ronald Reagan in the weeks before the Republican Convention of 1976:

"About a month before the convention, my aides had met with Reagan's representatives to discuss the need for party unity. And they had reached an agreement. At the end of the Presidential balloting, the winner would go to the loser's hotel suite and congratulate his opponent for waging a fine campaign. Together, they would appear at a press conference and urge all Republicans to put aside their differences and rally behind the ticket. That was the only way we could leave Kansas City with a hope of victory. When it appeared I was going to win, Sears contacted Cheney and refined the scenario. He insisted on two conditions. The first was that I had to see Reagan alone; there could be no aides from either camp in the room. Secondly, under no circumstances should I offer him the nomination to be

Nation did use occasional sentences that closely resembled language in the original Ford manuscript.[9]  But these linguistic similarities are insufficient to constitute an infringement for three reasons.  First, some leeway must be given to subsequent authors seeking to convey facts because those "wishing to express the ideas contained in a factual work

---

Vice President.  Reagan had said all along that he wasn't interested in the job.  He had meant what he said.  If I tried to talk him out of it, he would have to turn me down, and that would be embarrassing because it would appear that he was refusing to help the GOP.  When Cheney relayed those conditions to me, I agreed to go along with them.  I would need Reagan's assistance in the fall campaign.  It would be stupid to anger him or his followers at this moment.

"Later I was told that just before my arrival at the Californian's hotel, one of his closest advisors, businessman Justin Dart, had urged him to say yes if I asked him to be my running mate,  Regardless of anything he'd said before, Dart had insisted, it was his patriotic duty to accept the number two post.  Finally, according to Dart, Reagan had agreed.  But at the time, no one mentioned this new development to me.  Had I been aware of the Dart-Reagan conversation, would I have chosen him?  I can't say for sure—I thought his challenge had been divisive, and that it would probably hurt the party in the fall campaign; additionally, I resented some of the things that he'd been saying about me and my Administration's policies—but I certainly would have considered him."  App. 628–629.

The Nation encapsulated this discussion in the following sentence: "Ford also writes that, but for a misunderstanding, he might have selected Ronald Reagan as his 1976 running mate."  *Id.*, at 627.  In most other instances, a single sentence or brief paragraph in The Nation's article similarly conveys the gist of a discussion in the Ford manuscript that runs into the hundreds of words.  See generally Addendum B to Defendant's Post-Trial Memorandum, *id.*, at 627–704.

[9] For example, at one point The Nation's article reads: "Ford told a Jackson, Mich., luncheon audience later in the day that the President was not guilty of an impeachable offense."  *Ante*, at 572.  The portion of the Ford manuscript discussed stated: "Representative Thad Cochran . . . escorted me to a luncheon at the Jackson Hilton Hotel.  During the luncheon I repeated my assertion that the President was not guilty of an impeachable offense."  App. 649.  In several other places the language in The Nation's article parallels Mr. Ford's original expression to a similar degree.  Compare *ante*, at 570–579, with App. 627–704.

often can choose from only a narrow range of expression." *Landsberg* v. *Scrabble Crossword Game Players, Inc.*, 736 F. 2d 485, 488 (CA9 1984). Second, much of what The Nation paraphrased was material in which Harper & Row could claim no copyright.[10] Third, The Nation paraphrased nothing approximating the totality of a single paragraph, much less a chapter or the work as a whole. At most The Nation paraphrased disparate isolated sentences from the original. A finding of infringement based on paraphrase generally requires far more close and substantial a tracking of the original language than occurred in this case. See, *e. g.*, *Wainwright Securities Inc.* v. *Wall Street Transcript Corp.*, 558 F. 2d 91 (CA2 1977).

*The Structure of Presentation.* The article does not mimic Mr. Ford's structure. The information The Nation presents is drawn from scattered sections of the Ford work and does not appear in the sequence in which Mr. Ford presented it.[11] Some of The Nation's discussion of the pardon does roughly track the order in which the Ford manuscript presents information about the pardon. With respect to this similarity, however, Mr. Ford has done no more than present the facts

---

[10] Often the paraphrasing was of statements others had made to Mr. Ford. *E. g., ante,* at 571 ("He could 'ride it out' or he could resign, Haig said"). See generally *ante,* at 570–579. No copyright can be asserted in the verbatim representation of such statements of others. 17 U. S. C. § 102. See *Suid* v. *Newsweek Magazine,* 503 F. Supp., at 148; *Rokeach* v. *Avco Embassy Pictures Corp.,* 197 USPQ, at 161. Other paraphrased material came from Government documents in which no copyright interest can be claimed. For example, the article quotes from a memorandum prepared by Henry S. Ruth, Jr., in his official capacity as assistant to Watergate Special Prosecutor Leon Jaworski. See *ante,* at 573. This document is a work of the United States Government. See 17 U. S. C. § 105.

[11] According to an exhibit Harper & Row introduced at trial the pages in the Ford manuscript that correspond to consecutive sections of the article are as follows: 607–608, 401, 44, 496, 1, 2–3, 4, 8, 7, 4–5, 5, 5–6, 8, 14, 15, 16, 16, 18, 19, 21, 266, 236, 246, 248, 249, 238–239, 239, 243, 245, 246, 250, 250–251, 251, 252, 253, 254, 256, 298, 299, 46, 494, 537, 155–156, 216, 415, 416, 416, 53–54, 57. See App. to Pet. for Cert. E–1 to E–41.

chronologically and cannot claim infringement when a subsequent author similarly presents the facts of history in a chronological manner. Also, it is difficult to suggest that a 2,000-word article could bodily appropriate the structure of a 200,000-word book. Most of what Mr. Ford created, and most of the history he recounted, were simply not represented in The Nation's article.[12]

When The Nation was not quoting Mr. Ford, therefore, its efforts to convey the historical information in the Ford manuscript did not so closely and substantially track Mr. Ford's language and structure as to constitute an appropriation of literary form.

## II

The Nation is thus liable in copyright only if the quotation of 300 words infringed any of Harper & Row's exclusive rights under § 106 of the Act. Section 106 explicitly makes the grant of exclusive rights "[s]ubject to section 107 through 118." 17 U. S. C. § 106. Section 107 states: "Notwithstanding the provisions of section 106, the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research, is not an infringement of copyright." The question here is whether The Nation's

---

[12] In one sense The Nation "copied" Mr. Ford's selection of facts because it reported on only those facts Mr. Ford chose to select for presentation. But this tracking of a historian's selection of facts generally should not supply the basis for a finding of infringement. See *Myers* v. *Mail & Express Co.*, 36 Copyright Off. Bull. 478 (SDNY 1919) (L. Hand, J.). To hold otherwise would be to require a second author to duplicate the research of the first author so as to avoid reliance on the first author's judgment as to what facts are particularly pertinent. " 'It is just such wasted effort that the proscription against the copyright of ideas and facts . . . are designed to prevent.' " *Miller* v. *Universal City Studios, Inc.*, 650 F. 2d 1365, 1371 (CA5 1981), quoting *Rosemont Enterprises, Inc.* v. *Random House, Inc.*, 366 F. 2d 303, 310 (CA2 1966). See Gorman, 29 J. Copyright Soc., at 594–595.

quotation was a noninfringing fair use within the meaning of § 107.

Congress "eschewed a rigid, bright-line approach to fair use." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 449, n. 31. A court is to apply an "equitable rule of reason" analysis, *id.*, at 448, guided by four statutorily prescribed factors:

> "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;
>
> "(2) the nature of the copyrighted work;
>
> "(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> "(4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U. S. C. § 107.

These factors are not necessarily the exclusive determinants of the fair use inquiry and do not mechanistically resolve fair use issues; "no generally applicable definition is possible, and each case raising the question must be decided on its own facts." H. R. Rep. No. 94–1476, at 65. See also *id.*, at 66 ("[T]he endless variety of situations and combinations of circumstances that can arise in particular cases precludes the formulation of exact rules in the statute"); S. Rep. No. 94–473, p. 62 (1975). The statutory factors do, however, provide substantial guidance to courts undertaking the proper fact-specific inquiry.

With respect to a work of history, particularly the memoirs of a public official, the statutorily prescribed analysis cannot properly be conducted without constant attention to copyright's crucial distinction between protected literary form and unprotected information or ideas. The question must always be: Was the subsequent author's use of *literary form* a fair use within the meaning of § 107, in light of the purpose for the use, the nature of the copyrighted work, the amount of literary form used, and the effect of this use of literary form on the value of or market for the original?

Limiting the inquiry to the propriety of a subsequent author's use of the copyright owner's literary form is not easy in the case of a work of history. Protection against only substantial appropriation of literary form does not ensure historians a return commensurate with the full value of their labors. The literary form contained in works like "A Time to Heal" reflects only a part of the labor that goes into the book. It is the labor of collecting, sifting, organizing, and reflecting that predominates in the creation of works of history such as this one. The value this labor produces lies primarily in the information and ideas revealed, and not in the particular collocation of words through which the information and ideas are expressed. Copyright thus does not protect that which is often of most value in a work of history, and courts must resist the tendency to reject the fair use defense on the basis of their feeling that an author of history has been deprived of the full value of his or her labor. A subsequent author's taking of information and ideas is in no sense piratical because copyright law simply does not create any property interest in information and ideas.

The urge to compensate for subsequent use of information and ideas is perhaps understandable. An inequity seems to lurk in the idea that much of the fruit of the historian's labor may be used without compensation. This, however, is not some unforeseen byproduct of a statutory scheme intended primarily to ensure a return for works of the imagination. Congress made the affirmative choice that the copyright laws should apply in this way: "Copyright does not preclude others from using the ideas or information revealed by the author's work. It pertains to the literary . . . form in which the author expressed intellectual concepts." H. R. Rep. No. 94–1476, at 56–57. This distinction is at the essence of copyright. The copyright laws serve as the "engine of free expression," *ante*, at 558, only when the statutory monopoly does not choke off multifarious indirect uses and consequent broad dissemination of information and ideas. To ensure the progress of arts and sciences and the integrity

of First Amendment values, ideas and information must not be freighted with claims of proprietary right.[13]

In my judgment, the Court's fair use analysis has fallen to the temptation to find copyright violation based on a minimal use of literary form in order to provide compensation for the appropriation of information from a work of history. The failure to distinguish between information and literary form permeates every aspect of the Court's fair use analysis and leads the Court to the wrong result in this case. Application of the statutorily prescribed analysis with attention to the distinction between information and literary form leads to a straightforward finding of fair use within the meaning of § 107.

*The Purpose of the Use.* The Nation's purpose in quoting 300 words of the Ford manuscript was, as the Court acknowledges, news reporting. See *ante,* at 561. The Ford work contained information about important events of recent history. Two principals, Mr. Ford and General Alexander Haig, were at the time of The Nation's publication in 1979 widely thought to be candidates for the Presidency. That The Nation objectively reported the information in the Ford manuscript without independent commentary in no way diminishes the conclusion that it was reporting news. A typical newsstory differs from an editorial precisely in that it presents newsworthy information in a straightforward and unelaborated manner. Nor does the source of the information render The Nation's article any less a news report. Often books and manuscripts, solicited and unsolicited, are

---

[13] This congressional limitation on the scope of copyright does not threaten the production of history. That this limitation results in significant diminution of economic incentives is far from apparent. In any event noneconomic incentives motivate much historical research and writing. For example, former public officials often have great incentive to "tell their side of the story." And much history is the product of academic scholarship. Perhaps most importantly, the urge to preserve the past is as old as humankind.

the subject matter of news reports. *E. g., New York Times Co. v. United States,* 403 U. S. 713 (1971). Frequently the manuscripts are unpublished at the time of the news report.[14]

Section 107 lists news reporting as a prime example of fair use of another's expression. Like criticism and all other purposes Congress explicitly approved in § 107, news reporting informs the public; the language of § 107 makes clear that Congress saw the spread of knowledge and information as the strongest justification for a properly limited appropriation of expression. The Court of Appeals was therefore correct to conclude that the purpose of The Nation's use—dissemination of the information contained in the quotations of Mr. Ford's work—furthered the public interest. 723 F. 2d 195, 207–208 (CA2 1983). In light of the explicit congressional endorsement in § 107, the purpose for which Ford's literary form was borrowed strongly favors a finding of fair use.

The Court concedes the validity of the news reporting purpose[15] but then quickly offsets it against three purportedly countervailing considerations. First, the Court asserts that because The Nation publishes for profit, its publication of

---

[14] *E. g.,* N. Y. Times, Aug. 2, 1984, p. C20, col. 5 (article about revelations in forthcoming biography of Cardinal Spellman); N. Y. Times, Dec. 10, 1981, p. A18, col. 1 (article about revelations in forthcoming book by John Erlichman); N. Y. Times, Sept. 29, 1976, p. 1, col. 2 (article about revelations in forthcoming autobiography of President Nixon); N. Y. Times, Mar. 27, 1976, p. 9, col. 1 (article about revelations concerning President Nixon's resignation in forthcoming book The Final Days); N. Y. Times, Sept. 23, 1976, p. 36, col. 1 (article about revelations concerning President Ford in forthcoming book Blind Ambition by John Dean).

[15] The Court properly rejects the argument that this is not legitimate news. Courts have no business making such evaluations of journalistic quality. See *ante,* at 561. The Court also properly rejects the argument that this use is nonproductive. See *ibid.* News reporting, which encompasses journalistic judgment with respect to selection, organization, and presentation of facts and ideas, is certainly a productive use. See *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S., at 478–479 (BLACKMUN, J., dissenting).

the Ford quotes is a presumptively unfair commercial use. Second, the Court claims that The Nation's stated desire to create a "news event" signaled an illegitimate purpose of supplanting the copyright owner's right of first publication. *Ante,* at 562–563. Third, The Nation acted in bad faith, the Court claims, because its editor "knowingly exploited a purloined manuscript." *Ante,* at 563.

The Court's reliance on the commercial nature of The Nation's use as "a separate factor that tends to weigh against a finding of fair use," *ante,* at 562, is inappropriate in the present context. Many uses § 107 lists as paradigmatic examples of fair use, including criticism, comment, and *news reporting,* are generally conducted for profit in this country, a fact of which Congress was obviously aware when it enacted § 107. To negate any argument favoring fair use based on news reporting or criticism because that reporting or criticism was published for profit is to render meaningless the congressional imprimatur placed on such uses.[16]

Nor should The Nation's intent to create a "news event" weigh against a finding of fair use. Such a rule, like the

---

[16] To support this claim the Court refers to some language in *Sony Corp. of America* v. *Universal City Studios, Inc., supra,* to the effect that "every commercial use of copyrighted material is presumptively an unfair exploitation." *Id.,* at 451. See *ante,* at 562. Properly understood, this language does not support the Court's position in this case. The Court in *Sony Corp.* dealt with a use—video recording of copyrighted television programs for personal use—about which Congress had expressed no policy judgment. When a court evaluates uses that Congress has not specifically addressed, the presumption articulated in *Sony Corp.* is appropriate to effectuate the congressional instruction to consider "whether such use is of a commercial nature." 17 U. S. C. § 107(1). Also, the Court made that statement in the course of evaluating a use that appropriated the *entirety* of the copyrighted work in a form *identical* to that of the original; the presumption articulated may well have been intended to apply to takings under these circumstances. But, in light of the specific language of § 107, this presumption is not appropriately employed to negate the weight Congress explicitly gave to news reporting as a justification for limited use of another's expression.

Court's automatic presumption against news reporting for profit, would undermine the congressional validation of the news reporting purpose. A news business earns its reputation, and therefore its readership, through consistent prompt publication of news—and often through "scooping" rivals. More importantly, the Court's failure to maintain the distinction between information and literary form colors the analysis of this point. Because Harper & Row had no legitimate copyright interest in the information and ideas in the Ford manuscript, The Nation had every right to seek to be the first to disclose these facts and ideas to the public. The record suggests only that The Nation sought to be the first to reveal the information in the Ford manuscript. The Nation's stated purpose of scooping the competition should under those circumstances have no negative bearing on the claim of fair use. Indeed the Court's reliance on this factor would seem to amount to little more than distaste for the standard journalistic practice of seeking to be the first to publish news.

The Court's reliance on The Nation's putative bad faith is equally unwarranted. No court has found that The Nation possessed the Ford manuscript illegally or in violation of any common-law interest of Harper & Row; all common-law causes of action have been abandoned or dismissed in this case. 723 F. 2d, at 199–201. Even if the manuscript had been "purloined" by someone, nothing in this record imputes culpability to The Nation.[17] On the basis of the record in this case, the most that can be said is that The Nation made use of the contents of the manuscript knowing the copyright owner would not sanction the use.

---

[17] This case is a far cry from *Time Inc.* v. *Bernard Geis Associates,* 293 F. Supp. 130, 146 (SDNY 1968), the only case the Court cites to support consideration of The Nation's purported bad faith. In that case the publisher claiming fair use had personally stolen film negatives from the offices of Time and then published graphic representations of the stolen photographic images. And the court found fair use despite these circumstances. *Ibid.*

At several points the Court brands this conduct thievery. See, *e. g., ante,* at 556, 563. This judgment is unsupportable, and is perhaps influenced by the Court's unspoken tendency in this case to find infringement based on the taking of information and ideas. With respect to the appropriation of information and ideas other than the quoted words, The Nation's use was perfectly legitimate despite the copyright owner's objection because no copyright can be claimed in ideas or information. Whether the quotation of 300 words was an infringement or a fair use within the meaning of § 107 is a close question that has produced sharp division in both this Court and the Court of Appeals. If the Copyright Act were held not to prohibit the use, then the copyright owner would have had no basis in law for objecting. The Nation's awareness of an objection that has a significant chance of being adjudged unfounded cannot amount to bad faith. Imputing bad faith on the basis of no more than knowledge of such an objection, the Court impermissibly prejudices the inquiry and impedes arrival at the proper conclusion that the "purpose" factor of the statutorily prescribed analysis strongly favors a finding of fair use in this case.

*The Nature of the Copyrighted Work.* In *Sony Corp. of America* v. *Universal City Studios, Inc.,* we stated that "not . . . all copyrights are fungible" and that "[c]opying a news broadcast may have a stronger claim to fair use than copying a motion picture." 464 U. S., at 455, n. 40. These statements reflect the principle, suggested in § 107(2) of the Act, that the scope of fair use is generally broader when the source of borrowed expression is a factual or historical work. See 3 Nimmer § 13.05[A][2], at 13-73—13-74. "[I]nformational works," like the Ford manuscript, "that readily lend themselves to productive use by others, are less protected." *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S., at 496-497 (BLACKMUN, J., dissenting). Thus the second statutory factor also favors a finding of fair use in this case.

The Court acknowledges that "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy," *ante,* at 563, and that "[s]ome of the briefer quotations from the memoir are arguably necessary to convey the facts," *ibid.* But the Court discounts the force of this consideration, primarily on the ground that "[t]he fact that a work is unpublished is a crucial element of its 'nature.'" *Ante,* at 564.[18] At this point the Court introduces into analysis of this case a categorical presumption against prepublication fair use. See *ante,* at 555 ("Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use").

This categorical presumption is unwarranted on its own terms and unfaithful to congressional intent.[19] Whether a

---

[18] The Court also discounts this factor in part because the appropriation of The Nation, "focusing on the most expressive elements of the work, exceeds that necessary to disseminate the facts." *Ante,* at 564. Whatever the propriety of this view of The Nation's use, it is properly analyzed under the third statutory fair use factor—the amount and substantiality of the expression taken in relation to the copyrighted work as a whole, 17 U. S. C. § 107(3)—and will be analyzed as such in this opinion.

[19] The Court lays claim to specific congressional intent supporting the presumption against prepublication fair use. See *ante,* at 553, quoting S. Rep. No. 94–473, p. 64 (1975); *ante,* at 551, n. 4, 553–554. The argument based on congressional intent is unpersuasive for three reasons.

First, the face of the statute clearly allows for prepublication fair use. The right of first publication, like all other rights § 106 of the Act specifically grants copyright owners, is explicitly made "subject to section 107," the statutory fair use provision. See 17 U. S. C. § 106.

Second, the language from the Senate Report on which the Court relies so heavily, see *ante,* at 553, simply will not bear the weight the Court places on it. The Senate Report merely suggests that prepublication photocopying for classroom purposes will not generally constitute fair use when the author has an interest in the confidentiality of the unpublished work, evidenced by the author's "deliberate choice" not to publish. Given that the face of § 106 specifically allows for prepublication fair use, it would be unfaithful to the intent of Congress to draw from this circumscribed

particular prepublication use will impair any interest the Court identifies as encompassed within the right of first publication, see *ante,* at 552–555,[20] will depend on the nature of the copyrighted work, the timing of prepublication use, the amount of expression used, and the medium in which the second author communicates. Also, certain uses might be tolerable for some purposes but not for others. See *Sony Corp. of America* v. *Universal City Studios, Inc., supra,* at 490, n. 40. The Court is ambiguous as to whether it relies on the force of the presumption against prepublication fair use or an analysis of the purpose and effect of this particular use. Compare *ante,* at 552–555, with *ante,* at 564. To the extent the Court relies on the presumption, it presumes intolerable

---

suggestion in the Senate Report a blanket presumption against any amount of prepublication fair use for any purpose and irrespective of the effect of that use on the copyright owner's privacy, editorial, or economic interests.

Third, the Court's reliance on congressional adoption of the common law is also unpersuasive. The common law did not set up the monolithic barrier to prepublication fair use that the Court wishes it did. See, *e. g., Estate of Hemingway* v. *Random House, Inc.,* 53 Misc. 2d 462, 279 N. Y. S. 2d 51 (S. Ct. N. Y. Cty.), aff'd, 29 App. Div. 2d 633, 285 N. Y. S. 2d 568 (1st Jud. Dept. 1967), aff'd on other grounds, 23 N. Y. 2d 341, 244 N. E. 2d 250 (1968). The statements of general principle the Court cites to support its contrary representation of the common law, see *ante,* at 551, n. 4, are themselves unsupported by reference to substantial judicial authority. Congressional endorsement of the common law of fair use should not be read as adoption of any rigid presumption against prepublication use. If read that way, the broad statement that the Copyright Act was intended to incorporate the common law would in effect be given the force of nullifying Congress' repeated methodological prescription that definite rules are inappropriate and fact-specific analysis is required. The broad language adopting the common-law approach to fair use is best understood as an endorsement of the essential fact-specificity and case-by-case methodology of the common law of fair use.

[20] The Court finds the right of first publication particularly weighty because it encompasses three important interests: (i) a privacy interest in whether to make expression public at all; (ii) an editorial interest in ensuring control over the work while it is being groomed for public dissemination; and (iii) an economic interest in capturing the full remunerative potential of initial release to the public. *Ante,* at 552–555.

injury—in particular the usurpation of the economic interest [21]—based on no more than a quick litmus test for prepublication timing. Because "Congress has plainly instructed us that fair use analysis calls for a sensitive balancing of interests," we held last Term that the fair use inquiry could never be resolved on the basis of such a "two dimensional" categorical approach. See *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 455, n. 40 (rejecting categorical requirement of "productive use").

To the extent the Court purports to evaluate the facts of this case, its analysis relies on sheer speculation. The quotation of 300 words from the manuscript infringed no privacy interest of Mr. Ford. This author intended the words in the manuscript to be a public statement about his Presidency. Lacking, therefore, is the "deliberate choice on the part of the copyright owner" to keep expression confidential, a consideration that the Senate Report—in the passage on which the Court places great reliance, see *ante*, at 553—recognized as the impetus behind narrowing fair use for unpublished works. See S. Rep. No. 94–473, at 64. See also 3 Nimmer § 13.05[A], at 13–73 ("[T]he scope of the fair use doctrine is considerably narrower with respect to unpublished works *which are held confidential by their copyright owners*") (emphasis added). What the Court depicts as the copyright owner's "confidentiality" interest, see *ante*, at 564, is not a privacy interest at all. Rather, it is no more than an economic interest in capturing the full value of initial release of information to

---

[21] Perhaps most inappropriate is the Court's apocalyptic prophesy that permitting any prepublication use for news reporting will "effectively destroy any expectation of copyright protection in the work of a public figure." *Ante*, at 557. The impact of a prepublication use for purposes of news reporting will obviously vary with the circumstances. A claim of news reporting should not be a fig leaf for substantial plagiarism, see *Wainwright Securities Inc.* v. *Wall Street Transcript Corp.*, 558 F. 2d 91 (CA2 1977), but there is no warrant for concluding that prepublication quotation of a few sentences will usually drain all value from a copyright owner's right of first publication.

the public, and is properly analyzed as such. See *infra,* at 602–603. Lacking too is any suggestion that The Nation's use interfered with the copyright owner's interest in editorial control of the manuscript. The Nation made use of the Ford quotes on the eve of official publication.

Thus the only interest The Nation's prepublication use might have infringed is the copyright owner's interest in capturing the full economic value of initial release. By considering this interest as a component of the "nature" of the copyrighted work, the Court's analysis deflates The Nation's claim that the informational nature of the work supports fair use without any inquiry into the actual or potential economic harm of The Nation's particular prepublication use. For this reason, the question of economic harm is properly considered under the fourth statutory factor—the effect on the value of or market for the copyrighted work, 17 U. S. C. § 107(4)—and not as a presumed element of the "nature" of the copyright.

*The Amount and Substantiality of the Portion Used.* More difficult questions arise with respect to judgments about the importance to this case of the amount and substantiality of the quotations used. The Nation quoted only approximately 300 words from a manuscript of more than 200,000 words, and the quotes are drawn from isolated passages in disparate sections of the work. The judgment that this taking was quantitatively "infinitesimal," 723 F. 2d, at 209, does not dispose of the inquiry, however. An evaluation of substantiality in qualitative terms is also required. Much of the quoted material was Mr. Ford's matter-of-fact representation of the words of others in conversations with him; such quotations are "arguably necessary adequately to convey the facts," *ante,* at 563, and are not rich in expressive content. Beyond these quotations a portion of the quoted material was drawn from the most poignant expression in the Ford manuscript; in particular The Nation made use of six examples of Mr. Ford's expression of his reflections on

events or perceptions about President Nixon.[22]   The fair use inquiry turns on the propriety of the use of these quotations with admittedly strong expressive content.

The Court holds that "in view of the expressive value of the excerpts and their key role in the infringing work," this third statutory factor disfavors a finding of fair use.[23]   To support

---

[22] These six quotes are:

(1) " '[C]ompassion for Nixon as an individual hadn't prompted my decision at all.'   Rather, he did it because he had 'to get the monkey off my back one way or the other.' "   *Ante,* at 572–573.

(2) "Nixon 'would not spend the time quietly in San Clemente,' and 'it would be virtually impossible for me to direct public attention on anything else.' "   *Ante,* at 573.

(3) " 'I learned that public policy often took precedence over a rule of law. Although I respected the tenet that no man should be above the law, public policy demanded that I put Nixon—and Watergate—behind us as quickly as possible.' "   *Ante,* at 575.

(4) " 'If I made the trip it would remind everybody of Watergate and the pardon.   If I didn't people would say I lacked compassion.' "   *Ibid.*

(5) "He was stretched out flat on his back.   There were tubes in his nose and mouth, and wires led from his arms, chest and legs to machines with orange lights that blinked on and off.   His face was ashen, and I thought I had never seen anyone closer to death."   *Ibid.*

(6) " 'A terribly proud man,' writes Ford, 'he detested weakness in other people.   I'd often heard him speak disparagingly of those whom he felt to be soft and expedient.   (Curiously, he didn't feel that the press was weak. Reporters, he sensed, were his adversaries.   He knew they didn't like him, and he responded with reciprocal disdain.)' . . . 'His pride and personal contempt for weakness had overcome his ability to tell the difference between right and wrong.' . . . 'Nixon was out of touch with reality.' " *Ante,* at 578.

[23] The Court places some emphasis on the fact that the quotations from the Ford work constituted a substantial portion of The Nation's article. Superficially, the Court would thus appear to be evaluating The Nation's quotation of 300 words in relation to the amount and substantiality of expression used in relation to the second author's work as a whole.   The statute directs the inquiry into "the amount and substantiality of the portion used in relation to *the copyrighted work* as a whole," 17 U. S. C. § 107(3) (emphasis added).   As the statutory directive implies, it matters little

this conclusion, the Court purports to rely on the District Court factual findings that The Nation had taken "the heart of the book." 557 F. Supp. 1062, 1072 (SDNY 1983). This reliance is misplaced, and would appear to be another result of the Court's failure to distinguish between information and literary form. When the District Court made this finding, it was evaluating not the quoted words at issue here but the "totality" of the information and reflective commentary in the Ford work. *Ibid.* The vast majority of what the District Court considered the heart of the Ford work, therefore, consisted of ideas and information The Nation was free to use. It may well be that, as a qualitative matter, most of the value of the manuscript did lie in the information and ideas The Nation used. But appropriation of the "heart" of the manuscript in this sense is irrelevant to copyright analysis because copyright does not preclude a second author's use of information and ideas.

Perhaps tacitly recognizing that reliance on the District Court finding is unjustifiable, the Court goes on to evaluate independently the quality of the expression appearing in The Nation's article. The Court states that "[t]he portions actually quoted were selected by Mr. Navasky as among the most powerful passages." *Ante,* at 565. On the basis of no more than this observation, and perhaps also inference from the fact that the quotes were important to The Nation's article,[24] the Court adheres to its conclusion that The Nation appropriated the heart of the Ford manuscript.

---

whether the second author's use is 1- or 100-percent appropriated expression if the taking of that expression had no adverse effect on the copyrighted work. See *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S. 417 (1984) (100% of expression taken). I presume, therefore, that the Court considered the role of the expression "in the infringing work" only as indirect evidence of the qualitative value of the expression taken in this case. If read this way, the point dovetails with the Court's major argument that The Nation appropriated the most valuable sentences of the work.

[24] See n. 23, *supra.*

At least with respect to the six particular quotes of Mr. Ford's observations and reflections about President Nixon, I agree with the Court's conclusion that The Nation appropriated some literary form of substantial quality. I do not agree, however, that the substantiality of the expression taken was clearly excessive or inappropriate to The Nation's news reporting purpose.

Had these quotations been used in the context of a critical book review of the Ford work, there is little question that such a use would be fair use within the meaning of § 107 of the Act. The amount and substantiality of the use—in both quantitative and qualitative terms—would have certainly been appropriate to the purpose of such a use. It is difficult to see how the use of these quoted words in a news report is less appropriate. The Court acknowledges as much: "[E]ven substantial quotations might qualify as a fair use in a review of a published work or a news account of a speech that had been delivered to the public." See ante, at 564. With respect to the motivation for the pardon and the insights into the psyche of the fallen President, for example, Mr. Ford's reflections and perceptions are so laden with emotion and deeply personal value judgments that full understanding is immeasurably enhanced by reproducing a limited portion of Mr. Ford's own words. The importance of the work, after all, lies not only in revelation of previously unknown fact but also in revelation of the thoughts, ideas, motivations, and fears of two Presidents at a critical moment in our national history. Thus, while the question is not easily resolved, it is difficult to say that the use of the six quotations was gratuitous in relation to the news reporting purpose.

Conceding that even substantial quotation is appropriate in a news report of a *published* work, the Court would seem to agree that this quotation was not clearly inappropriate in relation to The Nation's news reporting purpose. For the Court, the determinative factor is again that the substantiality of the use was inappropriate in relation to the pre-

publication timing of that use. That is really an objection to the effect of this use on the market for the copyrighted work, and is properly evaluated as such.

*The Effect on the Market.* The Court correctly notes that the effect on the market "is undoubtedly the single most important element of fair use." *Ante,* at 566, citing 3 Nimmer § 13.05[A], at 13–76, and the Court properly focuses on whether The Nation's use adversely affected Harper & Row's serialization potential and not merely the market for sales of the Ford work itself. *Ante,* at 566–567. Unfortunately, the Court's failure to distinguish between the use of information and the appropriation of literary form badly skews its analysis of this factor.

For purposes of fair use analysis, the Court holds, it is sufficient that the *entire article* containing the quotes eroded the serialization market potential of Mr. Ford's work. *Ante,* at 567. On the basis of Time's cancellation of its serialization agreement, the Court finds that "[r]arely will a case of copyright infringement present such clear-cut evidence of actual damage." *Ibid.* In essence, the Court finds that by using some quotes in a story about the Nixon pardon, The Nation "competed for a share of the market of prepublication excerpts" *ante,* at 568, because Time planned to excerpt from the chapters about the pardon.

The Nation's publication indisputably precipitated Time's eventual cancellation. But that does not mean that The Nation's use of the 300 quoted words caused this injury to Harper & Row. Wholly apart from these quoted words, The Nation published significant information and ideas from the Ford manuscript. If it was this publication of information, and not the publication of the few quotations, that caused Time to abrogate its serialization agreement, then whatever the negative effect on the serialization market, that effect was the product of wholly legitimate activity.

The Court of Appeals specifically held that "the evidence does not support a finding that it was the very limited use of expression per se which led to *Time's* decision not to print ex-

cerpts." 723 F. 2d, at 208. I fully agree with this holding. If The Nation competed with Time, the competition was not for a share of the market in excerpts of literary form but for a share of the market in the new information in the Ford work. That the information, and not the literary form, represents most of the real value of the work in this case is perhaps best revealed by the following provision in the contract between Harper & Row and Mr. Ford:

> "Author acknowledges that the value of the rights granted to publisher hereunder would be substantially diminished by Author's public discussion of the unique information not previously disclosed about Author's career and personal life which will be included in the Work, and Author agrees that Author will endeavor not to disseminate any such information in any media, including television, radio and newspaper and magazine interviews prior to the first publication of the work hereunder." App. 484.

The contract thus makes clear that Harper & Row sought to benefit substantially from monopolizing the initial revelation of information known only to Ford.

Because The Nation was the first to convey the information in this case, it did perhaps take from Harper & Row some of the value that publisher sought to garner for itself through the contractual arrangement with Ford and the license to Time. Harper & Row had every right to seek to monopolize revenue from that potential market through contractual arrangements but it has no right to set up copyright as a shield from competition in that market because copyright does not protect information. The Nation had every right to seek to be the first to publish that information.[25]

---

[25] The Court's reliance on the principle that "an infringer who mingles infringing and noninfringing elements 'must abide the consequences,'" *ante*, at 567 (citation omitted), is misconceived. Once infringement of a § 106 exclusive right has been shown, it is entirely appropriate to shift to

*Balancing the Interests.* Once the distinction between information and literary form is made clear, the statutorily prescribed process of weighing the four statutory fair use factors discussed above leads naturally to a conclusion that The Nation's limited use of literary form was not an infringement. Both the purpose of the use and the nature of the copyrighted work strongly favor the fair use defense here. The Nation appropriated Mr. Ford's expression for a purpose Congress expressly authorized in § 107 and borrowed from a work whose nature justifies some appropriation to facilitate the spread of information. The factor that is perhaps least favorable to the claim of fair use is the amount and substantiality of the expression used. Without question, a portion of the expression appropriated was among the most poignant in the Ford manuscript. But it is difficult to conclude that this taking was excessive in relation to the news reporting purpose. In any event, because the appropriation of literary form—as opposed to the use of information—was not shown to injure Harper & Row's economic interest, any uncertainty with respect to the propriety of the amount of expression borrowed should be resolved in favor of a finding of fair use.[26] In light of the circumscribed scope of the quotation in The Nation's article and the undoubted validity of the purpose

---

the infringer the burden of showing that the infringement did not cause all the damages shown. But the *question* in this case is whether this particular use infringed any § 106 rights. Harper & Row may have shown actual damage flowing from The Nation's use of information, but they have not shown actual damage flowing from an infringement of a § 106 exclusive right.

[26] Had The Nation sought to justify a more substantial appropriation of expression on a news reporting rationale, a different case might be presented. The substantiality of the taking would certainly dilute the claim of need to use the first author's exact words to convey a particular thought or sentiment. Even if the claim of need were plausible, the equities would have to favor the copyright owner in order to prevent erosion of virtually all copyright protection for works of former public officials. In this case, however, the need is manifest and the integrity of copyright protection for the works of public officials is not threatened.

motivating that quotation, I must conclude that the Court has simply adopted an exceedingly narrow view of fair use in order to impose liability for what was in essence a taking of unprotected information.

## III

The Court's exceedingly narrow approach to fair use permits Harper & Row to monopolize information. This holding "effect[s] an important extension of property rights and a corresponding curtailment in the free use of knowledge and of ideas." *International News Service* v. *Associated Press*, 248 U. S., at 263 (Brandeis, J., dissenting). The Court has perhaps advanced the ability of the historian—or at least the public official who has recently left office—to capture the full economic value of information in his or her possession. But the Court does so only by risking the robust debate of public issues that is the "essence of self-government." *Garrison* v. *Louisiana*, 379 U. S., at 74–75. The Nation was providing the grist for that robust debate. The Court imposes liability upon The Nation for no other reason than that The Nation succeeded in being the first to provide certain information to the public. I dissent.